**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 17 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MAINSTREAM MARKETING
SERVICES, INC., a Colorado
corporation; TMG MARKETING,
INC., a Colorado corporation;
AMERICAN TELESERVICES
ASSOCIATION,

     Plaintiffs-Appellees,

v.

FEDERAL TRADE COMMISSION,

     Defendant-Appellant,

and

TIMOTHY J. MURIS, Chairman of
the Federal Trade Commission;
SHEILA F. ANTHONY,
Commissioner, Federal Trade
Commission; MOZELLE W.
THOMPSON, Commissioner, Federal
Trade Commission; ORSON
SWINDLE, Commissioner, Federal
Trade Commission; THOMAS B.
LEARY, Commissioner, Federal Trade
Commission; J. HOWARD BEALES,
III, Director, Bureau of Consumer
Protection, in their official capacities,

     Defendants.

No. 03-1429

UNITED STATES OF AMERICA,

     Intervenor,

ALABAMA, ALASKA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, IDAHO, ILLINOIS, IOWA, KANSAS, KENTUCKY, LOUISIANA, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSISSIPPI, MISSOURI, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, PUERTO RICO, RHODE ISLAND, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, VERMONT, VIRGINIA, WASHINGTON, WEST VIRGINIA AND WYOMING; AARP; W.J. "BILLY" TAUZI, JOHN D. DINGELL, and certain other members of the House of Representatives of the United States; ACA INTERNATIONAL; UNDERSIGNED MEMBERS OF THE UNITED STATES SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION; THE COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS, THE

AMERICAN ASSOCIATION FOR
PUBLIC OPINION RESEARCH, THE
COUNCIL FOR MARKETING AND
OPINION RESEARCH,

    Amici Curiae.

_____

U.S. SECURITY, an Oklahoma
corporation; CHARTERED BENEFIT
SERVICES, INC., an Illinois
corporation, GLOBAL CONTACT
SERVICES, INC., a Delaware
corporation; INFOCISION
MANAGEMENT CORPORATION,
a Delaware corporation; DIRECT
MARKETING ASSOCIATION, INC.,
a New York non-profit association,

    Plaintiffs-Appellees,

v.

FEDERAL TRADE COMMISSION,

    Defendant-Appellant.

_____

ALABAMA, ALASKA, ARIZONA,
ARKANSAS, CALIFORNIA,
COLORADO, CONNECTICUT,
DELAWARE, DISTRICT OF
COLUMBIA, FLORIDA, GEORGIA,
HAWAII, IDAHO, ILLINOIS, IOWA,
KANSAS, KENTUCKY,
LOUISIANA, MAINE, MARYLAND,
MASSACHUSETTS, MICHIGAN,
MINNESOTA, MISSISSIPPI,
MISSOURI, MONTANA, NEVADA,

No. 03-6258

- 3 -

NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, PUERTO RICO, RHODE ISLAND, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, VERMONT, VIRGINIA, WASHINGTON, WEST VIRGINIA AND WYOMING; ACA INTERNATIONAL; THE COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS, THE AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH, THE COUNCIL FOR MARKETING AND OPINION RESEARCH,

     Amici Curiae.

03-9571

MAINSTEAM MARKETING SERVICES, INC., a Colorado corporation; TMG MARKETING, INC., a Colorado corporation; AMERICAN TELESERVICES ASSOCIATION,

     Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

     Respondents.

- 4 -

ALABAMA, ALASKA, ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, IDAHO, ILLINOIS, IOWA, KANSAS, KENTUCKY, LOUISIANA, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSISSIPPI, MISSOURI, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO,  NEW YORK, NORTH CAROLINA, OHIO, OKLAHOMA, OREGON, PENNSYLVANIA, PUERTO RICO, RHODE ISLAND, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, VERMONT, VIRGINIA, WASHINGTON, WEST VIRGINIA AND WYOMING; ACA INTERNATIONAL; THE COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS, THE AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH, THE COUNCIL FOR MARKETING AND OPINION RESEARCH,

     Amici Curiae.

COMPETITIVE
TELECOMMUNICATIONS
ASSOCIATION

     Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES
OF AMERICA,

     Respondents.

03-9594

---

THE COUNCIL OF AMERICAN
SURVEY RESEARCH
ORGANIZATIONS, THE
AMERICAN ASSOCIATION FOR
PUBLIC OPINION RESEARCH, THE
COUNCIL FOR MARKETING AND
OPINION RESEARCH,

     Amici Curiae.

---

**No. 03-1429**
**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 03-N-184 (MJW))**

**No. 03-6258**
**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 03-CV-122-W)**

---

Peter D. Keisler, Assistant Attorney General, Washington, D.C.; Lawrence DeMille-Wagman, Attorney, Federal Trade Commission, Washington, D.C., for Defendant-Appellant Federal Trade Commission; Jacob M. Lewis, Associate General Counsel, Federal Communications Commission, Washington, D.C., for Respondent Federal Communications Commission; (John A. Rogovin, General Counsel, Susan L. Launer, Deputy Associate General Counsel, Laurence N. Bourne, Rodger D. Citron, Federal Communications Commission, Washington, D.C.; William E. Kovacic, General Counsel, John D. Graubert, Principal Deputy General Counsel; John F. Daly, Deputy General Counsel for Litigation, Federal Trade Commission, Washington, D.C.; John W. Suthers, United States Attorney, Robert G. McCampbell, United States Attorney; Mark B. Stern, Appellate Litigation Counsel; Alisa B. Klein, U.S. Department of Justice, Washington, D.C., Civil Division, with them on the briefs).

Robert Corn-Revere, Davis Wright Tremaine, LLP, Washington, D.C., for Plaintiffs-Appellees and Petitioners Mainstream Marketing Services, Inc., TMG Marketing, Inc., and American Teleservices Association; Thomas F. O'Neill, III, Piper Rudnick, Washington, D.C., for Plaintiffs-Appellees U.S. Security, Chartered Benefit Services, Inc., Global Contract Services, Inc., Infocision Management Corporation, and Direct Marketing Association, Inc. (Ronald G. London, Davis Wright Tremaine, LLP, Washington, D.C.; Sean R. Gallagher, Marianne N. Hallinan, Hogan & Hartson, LLP, Denver, Colorado; Douglas H. Green, John L. Moore, Jr., Emilio W. Cividanes, Piper Rudnick, Washington, D.C.; James Nesland, Jeffrey Smith, Cooley Godward LLP, Broomfield, Colorado, with them on the briefs).

Ian Heath Gershengorn, Jenner & Block, LLC, Washington, D.C., for Petitioner Competitive Telecommunications Association (Jonathan Lee, Vice President, Regulatory Affairs, Competitive Telecommunications Association, with him on the briefs.)

---

Before **SEYMOUR**, **EBEL** and **HENRY**, Circuit Judges.

**EBEL**, Circuit Judge.

The four cases consolidated in this appeal involve challenges to the national do-not-call registry, which allows individuals to register their phone numbers on a national "do-not-call list" and prohibits most commercial telemarketers from calling the numbers on that list. The primary issue in this case is whether the First Amendment prevents the government from establishing an opt-in telemarketing regulation that provides a mechanism for consumers to restrict commercial sales calls but does not provide a similar mechanism to limit charitable or political calls.[1] We hold that the do-not-call registry is a valid commercial speech regulation because it directly advances the government's important interests in safeguarding personal privacy and reducing the danger of telemarketing abuse without burdening an excessive amount of speech. In other words, there is a reasonable fit between the do-not-call regulations and the government's reasons for enacting them.

---

[1] The telemarketers also marshal attacks on the fees they must pay to access the national do-not-call registry and to the regulations' exception for commercial callers who have an established business relationship with the consumer. We address those alternative arguments in parts IV(A) and IV(B) below. Finally, in part IV(C), we discuss the FTC's statutory authority to enact its national do-not-call regulations.

As we discuss below in greater detail, four key aspects of the do-not-call registry convince us that it is consistent with First Amendment requirements. First, the list restricts only core commercial speech – i.e., commercial sales calls.[2] Second, the do-not-call registry targets speech that invades the privacy of the home, a personal sanctuary that enjoys a unique status in our constitutional jurisprudence. See Frisby v. Schultz, 487 U.S. 474, 484 (1988). Third, the do-not-call registry is an opt-in program that puts the choice of whether or not to restrict commercial calls entirely in the hands of consumers. Fourth, the do-not-call registry materially furthers the government's interests in combating the danger of abusive telemarketing and preventing the invasion of consumer privacy, blocking a significant number of the calls that cause these problems. Under these circumstances, we conclude that the requirements of the First Amendment are satisfied.

A number of additional features of the national do-not-call registry, although not dispositive, further demonstrate that the list is consistent with the First Amendment rights of commercial speakers. The challenged regulations do not hinder any business' ability to contact consumers by other means, such as through direct mailings or other forms of advertising. Moreover, they give consumers a number of different options to avoid calls they do not want to

---

[2] We express no opinion as to whether the do-not-call registry would be constitutional if it applied to political and charitable callers.

receive.  Namely, consumers who wish to restrict some but not all commercial sales calls can do so by using company-specific do-not-call lists or by granting some businesses express permission to call.[3]  In addition, the government chose to offer consumers broader options to restrict commercial sales calls than charitable and political calls after finding that commercial calls were more intrusive and posed a greater danger of consumer abuse.  The government also had evidence that the less restrictive company-specific do-not-call list did not solve the problems caused by commercial telemarketing, but it had no comparable evidence with respect to charitable and political fundraising.

The national do-not-call registry offers consumers a tool with which they can protect their homes against intrusions that Congress has determined to be particularly invasive.  Just as a consumer can avoid door-to-door peddlers by placing a "No Solicitation" sign in his or her front yard, the do-not-call registry lets consumers avoid unwanted sales pitches that invade the home via telephone, if they choose to do so.  We are convinced that the First Amendment does not prevent the government from giving consumers this option.

---

[3]  The company-specific do-not-call regulations require that a company must respect a consumer's request not to receive calls from or on behalf of that particular business.  See 16 C.F.R. § 310.4(b)(1)(iii)(A); 47 C.F.R. § 64.1200(d)(3).

## I. BACKGROUND

In 2003, two federal agencies – the Federal Trade Commission (FTC) and the Federal Communications Commission (FCC) – promulgated rules that together created the national do-not-call registry.  See 16 C.F.R. § 310.4(b)(1)(iii)(B) (FTC rule); 47 C.F.R. § 64.1200(c)(2) (FCC rule).[4]  The national do-not-call registry is a list containing the personal telephone numbers of telephone subscribers who have voluntarily indicated that they do not wish to receive unsolicited calls from commercial telemarketers.[5]  Commercial telemarketers are generally prohibited from calling phone numbers that have been placed on the do-not-call registry, and they must pay an annual fee to access the numbers on the registry so that they can delete those numbers from their telephone solicitation

---

[4]  Congress has directed the FCC to coordinate its efforts with the FTC in order to maximize consistency between the agencies' do-not-call regulations.  Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003).  Although the FTC and FCC rules are consistent in most respects, there are some situations in which a telemarketer could be subject to do-not-call restrictions under one agency's rule but exempt under the other's.  See Federal Trade Commission, Report to Congress Pursuant to the Do Not Call Implementation Act on Regulatory Coordination in Federal Telemarketing Laws (2003); Federal Communications Commission, Report on Regulatory Coordination (2003).  In the interest of simplicity, and because any inconsistencies between the two rules do not affect our constitutional analysis, we generally refer to both agencies' do-not-call provisions as a single regulatory measure (the do-not-call registry).  When we mean to discuss the FTC rule or the FCC rule in particular, we do so explicitly.

[5]  Consumers can register their personal phone numbers for the do-not-call list either by phone or online.

lists. So far, consumers have registered more than 50 million phone numbers on the national do-not-call registry.

The national do-not-call registry's restrictions apply only to telemarketing calls made by or on behalf of sellers of goods or services, and not to charitable or political fundraising calls. 16 C.F.R. §§ 310.4(b)(1)(iii)(B), 310.6(a); 47 C.F.R. §§ 64.1200(c)(2), 64.1200(f)(9).[6] Additionally, a seller may call consumers who have signed up for the national registry if it has an established business relationship with the consumer or if the consumer has given that seller express written permission to call. 16 C.F.R. § 310.4(b)(1)(iii)(B)(i-ii); 47 C.F.R. § 64.1200(f)(9)(i-ii).[7] Telemarketers generally have three months from the date

[6] There has been some confusion throughout this litigation with respect to how to define the term "telemarketing." Compare Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994, Pub. L. No. 103-297, 108 Stat. 1545 at §§ 7 (1994) ("Telemarketing Act") (defining "telemarketing" as calls "conducted to induce purchases of goods or services") with Mainstream Mktg. Servs., Inc. v. FTC, 283 F.Supp. 2d 1151, 1154 (D. Colo. 2003) (describing "telemarketing" as the practice of "soliciting sales and donations" conducted by businesses, charities, political organizations, and others). Unless otherwise indicated, we use the term "telemarketing" to refer to commercial sales calls made to induce purchases of goods or services (not charitable or political fundraising) consistent with Congress' definition in the Telemarketing Act.

[7] The "established business relationship" exception allows businesses to call customers with whom they have conducted a financial transaction or to whom they have sold, rented, or leased goods or services within 18 months of the telephone call. 47 C.F.R. § 64.1200(f)(3); Telemarketing Sales Rule, Statement of Basis and Purpose, 68 Fed. Reg. 4580, 4591 (Jan. 29, 2003). Additionally, sellers can call consumers on the national do-not-call registry within three months after the consumer makes an inquiry or application. 47 C.F.R § 64.1200(f)(3). A

(continued...)

- 12 -

on which a consumer signs up for the registry to remove the consumer's phone number from their call lists. 16 C.F.R. § 310.4(b)(3)(iv); 47 C.F.R. § 64.1200(c)(2)(i)(D). Consumer registrations remain valid for five years, and phone numbers that are disconnected or reassigned will be periodically removed from the registry. 47 C.F.R § 1200(c)(2); Telemarketing Sales Rule, Statement of Basis and Purpose, 68 Fed. Reg. 4580, 4640 (Jan. 29, 2003).

The national do-not-call registry is the product of a regulatory effort dating back to 1991 aimed at protecting the privacy rights of consumers and curbing the risk of telemarketing abuse. See generally FTC v. Mainstream Mktg. Servs., Inc., 345 F.3d 850, 857-58 (10th Cir. 2003). In the Telephone Consumer Protection Act of 1991 ("TCPA") – under which the FCC enacted its do-not-call rules – Congress found that for many consumers telemarketing sales calls constitute an intrusive invasion of privacy. See Pub. L. No. 102-243, 105 Stat. 2394 at § 2 (1991). Moreover, the TCPA's legislative history cited statistical data indicating that "most unwanted telephone solicitations are commercial in nature" and that "unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations." H.R. Rep. No. 102-317 at 16 (1991). The

---

[7](...continued) seller who has an established business relationship with a consumer is still bound to comply with the company-specific rules if the consumer requests not to be called. Id. at § 64.1200(f)(3)(i).

- 13 -

TCPA therefore authorized the FCC to establish a national database of consumers who object to receiving "telephone solicitations," which the act defined as commercial sales calls. Pub. L. No. 102-243, 105 Stat. 2394 at § 3.[8]

Furthermore, in the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994 ("Telemarketing Act") – under which the FTC enacted its do-not-call rules – Congress found that consumers lose an estimated $40 billion each year due to telemarketing fraud. See Pub. L. No. 103-297, 108 Stat. 1545 at § 2 (1994). Therefore, Congress authorized the FTC to prohibit sales calls that a reasonable consumer would consider coercive or abusive of his or her right to privacy. Id. at § 3.

The FCC and FTC initially sought to accomplish the goals of the TCPA and the Telemarketing Act by adopting company-specific do-not-call lists, requiring sellers to maintain lists of consumers who have requested not to be called by that particular solicitor, and requiring telemarketers to honor those requests. See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, 7 FCC Rcd. 8752 at ¶ 23-24 (Sept. 17, 1992); Telemarketing Sales Rule, Statement of Basis and Purpose, 60 Fed. Reg. 43842, 43854-55 (Aug. 23, 1995). Yet in enacting the national do-not-call registry, the

---

[8] The TCPA defines a "telephone solicitation" as a "telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services," excluding, inter alia, calls from tax exempt nonprofit organizations. Pub. L. No. 103-297, 108 Stat. 1545 at § 3.

- 14 -

agencies concluded that the company-specific lists had failed to achieve Congress' objectives.  See Telemarketing Sales Rule, Statement of Basis and Purpose, 68 Fed Reg. 4580, 4629, 4631 (Jan. 29, 2003); Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Reg. 44144, 44144-45 (July 25, 2003).  Among other shortfalls, the agencies explained that the large number of possible telephone solicitors made it burdensome for consumers to assert their rights under the company-specific rules, and that commercial telemarketers often ignored consumers' requests not to be called.  68 Fed. Reg. at 4629.  Accordingly, the agencies decided to keep the company-specific rules as an option available to consumers, but to supplement them with the national do-not-call registry.  Id.; 68 Fed. Reg. at 44144.

In this appeal we have consolidated four cases challenging various aspects of the national do-not-call registry.[9]  Cases Nos. 03-1429, 03-6258 and 03-9571 involve First Amendment attacks on the do-not-call list and its registry fees.  We

---

[9] Case No. 03-1429 reaches us on appeal from the District of Colorado, which held that the FTC's do-not-call rules were unconstitutional on First Amendment grounds. In that case, the district court enjoined the FTC from implementing the do-not-call registry.  We stayed that injunction, pending our review on the merits, in FTC v. Mainstream Mktg. Servs., Inc., 345 F.3d 850 (10th Cir. 2003).  Case No. 03-6258 reaches us on appeal from the Western District of Oklahoma, which held that the FTC lacked the statutory authority to enact its do-not-call rules.  In that case, the court also approved certain unrelated aspects of the Telemarketing Sales Rule, and the portions of its decision addressing those issues are not before us on appeal.  In cases No. 03-9571 and No. 03-9594, we review the FCC order directly pursuant to 47 U.S.C. § 402(a) and 28 U.S.C. § 2342.

address these issues in parts III and IV(A) respectively. Case No. 03-9594 involves a challenge to the FCC rule's established business relationship exception on administrative law grounds. We address this issue in part IV(B). Finally, in part IV(C), we address the alternative argument that the FTC lacked statutory authority to enact its do-not-call regulations, an argument that the district court relied upon in case No. 03-6258. We conclude that all of the telemarketers' challenges lack merit and we uphold the do-not-call list in its entirety.

## II. STANDARD OF REVIEW

The constitutionality of the national do-not-call registry and its fees under the First Amendment are questions of law we review de novo. See Phelan v. Laramie County Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1246 (10th Cir. 2000). We review whether the FCC's decision to include an established business relationship exception violated the Administrative Procedure Act under the arbitrary and capricious standard. See Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997). Finally, we review de novo a district court's decision that an agency lacked authority under the controlling statute to act, keeping in mind that the courts owe deference to a federal agency's interpretation of a statute it administers. See Southern Utah Wilderness Alliance v. Dabney,

222 F.3d 819, 824 (10th Cir. 2000) (citing <u>Chevron U.S.A., Inc. v. Natural Res.</u>

<u>Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984)).

## III. FIRST AMENDMENT ANALYSIS

The national do-not-call registry's telemarketing restrictions apply only to

commercial speech. Like most commercial speech regulations, the do-not-call

rules draw a line between commercial and non-commercial speech on the basis of

content. <u>See</u> <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 504 n.11

(1981) ("If commercial speech is to be distinguished, it must be distinguished by

its content."); <u>Bates v. State Bar of Ariz.</u>, 433 U.S. 350, 363 (1977) (same). In

reviewing commercial speech regulations, we apply the <u>Central Hudson</u> test.

<u>Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.</u>, 447 U.S. 557,

566 (1980); <u>see also</u> <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410,

416, 429-30 (1993) (noting that the challenged law drew content-based

distinctions between commercial and non-commercial speech and applying more

lenient scrutiny under <u>Central Hudson</u>); <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S.

618, 634-35 (1995) ("This case ... concerns pure commercial advertising, for

which we have always reserved a lesser degree of protection under the First

Amendment."); <u>Lanphere & Urbaniak v. Colorado</u>, 21 F.3d 1508, 1513 (10th Cir.

1994) (content-based regulations disadvantaging commercial speech are reviewed pursuant to the lesser degree of First Amendment protection provided in Central Hudson).

Central Hudson established a three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity. First, the government must assert a substantial interest to be achieved by the regulation. Central Hudson, 447 U.S. at 564. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide "only ineffective or remote support for the government's purpose." Id. Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary. See id.; Board of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989). Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends. United States v. Edge Broad. Co., 509 U.S. 418, 427-28 (1993).

The government bears the burden of asserting one or more substantial governmental interests and demonstrating a reasonable fit between those interests and the challenged regulation. Utah Licensed Beverage Ass'n v. Leavitt, 256 F.3d 1061, 1069 (10th Cir. 2001). The government is not limited in the evidence it may use to meet its burden. For example, a commercial speech regulation may

be justified by anecdotes, history, consensus, or simple common sense. Went For It, 515 U.S. at 628. Yet we may not take it upon ourselves to supplant the interests put forward by the state with our own ideas of what goals the challenged laws might serve. Edenfield v. Fane, 507 U.S. 761, 768 (1993).

A. Governmental Interests

The government asserts that the do-not-call regulations are justified by its interests in 1) protecting the privacy of individuals in their homes, and 2) protecting consumers against the risk of fraudulent and abusive solicitation. See 68 Fed. Reg. 44144; 68 Fed. Reg. at 4635. Both of these justifications are undisputedly substantial governmental interests.

In Rowan v. United States Post Office Dep't, the Supreme Court upheld the right of a homeowner to restrict material that could be mailed to his or her house. 397 U.S. 728 (1970). The Court emphasized the importance of individual privacy, particularly in the context of the home, stating that "the ancient concept that 'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality." Id. at 737. In Frisby v. Schultz, the Court again stressed the unique nature of the home and recognized that "the State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest

- 19 -

order in a free and civilized society." 487 U.S. 474, 484 (1988) (quoting Carey v. Brown, 447 U.S. 455, 471 (1980)). As the Court held in Frisby:

> One important aspect of residential privacy is protection of the unwilling listener. ... [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

Id. at 484-85 (citations omitted). Likewise, in Hill v. Colorado, the Court called the unwilling listener's interest in avoiding unwanted communication part of the broader right to be let alone that Justice Brandeis described as "the right most valued by civilized men." 530 U.S. 703, 716-17 (2000) (quoting Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)). The Court added that the right to avoid unwanted speech has special force in the context of the home. Id.; see also FCC v. Pacifica Found., 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home ... the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.").

Additionally, the Supreme Court has recognized that the government has a substantial interest in preventing abusive and coercive sales practices. Edenfield v. Fane, 507 U.S. 761, 768-69 (1993) ("[T]he First Amendment ... does not prohibit the State from insuring that the stream of commercial information flow[s] cleanly as well as freely.") (quoting Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72 (1976)).

- 20 -

B. Reasonable Fit

A reasonable fit exists between the do-not-call rules and the government's privacy and consumer protection interests if the regulation directly advances those interests and is narrowly tailored. See Central Hudson, 447 U.S. at 564-65. In this context, the "narrowly tailored" standard does not require that the government's response to protect substantial interests be the least restrictive measure available. All that is required is a proportional response. Board of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989).

In other words, the national do-not-call registry is valid if it is designed to provide effective support for the government's purposes and if the government did not suppress an excessive amount of speech when substantially narrower restrictions would have worked just as well. See Central Hudson, 447 U.S. at 564-65. These criteria are plainly established in this case. The do-not-call registry directly advances the government's interests by effectively blocking a significant number of the calls that cause the problems the government sought to redress. It is narrowly tailored because its opt-in character ensures that it does not inhibit any speech directed at the home of a willing listener.

## 1. Effectiveness

The telemarketers assert that the do-not-call registry is unconstitutionally underinclusive because it does not apply to charitable and political callers. First Amendment challenges based on underinclusiveness face an uphill battle in the commercial speech context. As a general rule, the First Amendment does not require that the government regulate all aspects of a problem before it can make progress on any front. United States v. Edge Broad. Co., 509 U.S. 418, 434 (1993). "Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments." Id. The underinclusiveness of a commercial speech regulation is relevant only if it renders the regulatory framework so irrational that it fails materially to advance the aims that it was purportedly designed to further. See Rubin v. Coors Brewing Co., 514 U.S. 476, 489 (1995); see also Central Hudson, 447 U.S. at 564 ("If a regulation "provides only ineffective or remote support for the government's purpose" it cannot be said to bear a reasonable fit with that purported objective). Cf. City of Ladue v. Gilleo, 512 U.S. 43, 51 (1994) (underinclusiveness provides a basis for a First Amendment claim when it constitutes an "attempt to give one side of a debatable public question an advantage in expressing its views to the people").

In Rubin, for example, the Supreme Court struck down a law prohibiting brewers from putting the alcohol content of their product on beer labels, purportedly in an effort to discourage "strength wars." 514 U.S. at 478. However, the law allowed advertisements disclosing the alcohol content of beers, allowed sellers of wines and spirits to disclose alcohol content on labels (and even required such disclosure for certain wines), and allowed brewers to signal high alcohol content by using the term "malt liquor." Id. at 488-89. Under these circumstances, the Court concluded that there was little chance that the beer label rule would materially deter strength wars in light of the "irrationality of this unique and puzzling regulatory framework." Id. at 489.

Likewise, in City of Cincinnati v. Discovery Network, the Court struck down a law prohibiting commercial newsracks on public property, purportedly in order to promote the safety and attractive appearance of its streets and sidewalks. 507 U.S. 410, 412 (1993). However, the ban applied to only 62 of the 1,500 to 2,000 newsracks in the city, thus addressing only a "minute" and "paltry" share of the problem. Id. at 417-18. Moreover, the challenged ordinance was not enacted in an effort to address problems posed by newsracks, but was actually an "outdated prohibition against the distribution of any commercial handbills on public property ... enacted long before any concern about newsracks developed."

Id.  For these reasons, the Court held in part II of that opinion that "the city did

not establish the reasonable fit we require."  Id. at 417-18.

Yet so long as a commercial speech regulation materially furthers its

objectives, underinclusiveness is not fatal under Central Hudson.  For example, in

Edge Broadcasting the Supreme Court approved a regulation that prohibited

broadcasters in North Carolina (which did not permit lotteries) from broadcasting

lottery advertisements on the radio, even as applied to a broadcaster located near

the border of Virginia (where lotteries were legal) whose audience consisted of

92.2 percent Virginians.  509 U.S. 418, 423-24, 431-33 (1993).  The Court found

it determinative that the regulation prevented lottery ads from reaching about

127,000 North Carolina residents (7.8 percent of Edge's listeners):[10]

> It could hardly be denied ... that these facts, standing alone, would clearly
> show that applying the statutory restriction to Edge would directly serve the
> statutory purpose of supporting North Carolina's antigambling policy....
> [T]his result could hardly be called either "ineffective," "remote," or
> "conditional."  Nor could it be called only "limited incremental support"
> for the Government interest.

Id. at 432 (citations omitted).  The Court rejected Edge's argument that the

regulations banning lottery advertising by in-state radio failed materially to

advance the government's interests because North Carolina residents were already

inundated with lottery advertising from other sources, such as Virginia radio and

_____

[10]  In the North Carolina counties Edge served, its broadcasts accounted for
about 11 percent of all radio listening.  Edge Broad., 509 U.S. at 431-32.

television programs. Id. at 434-35. "[T]he Government may be said to advance its purpose by substantially reducing lottery advertising, even where it is not wholly eradicated." Id. at 434; see also Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 511 (1981) ("[P]rohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising.").

As discussed above, the national do-not-call registry is designed to reduce intrusions into personal privacy and the risk of telemarketing fraud and abuse that accompany unwanted telephone solicitation. The registry directly advances those goals. So far, more than 50 million telephone numbers have been registered on the do-not-call list, and the do-not-call regulations protect these households from receiving most unwanted telemarketing calls. According to the telemarketers' own estimate, 2.64 telemarketing calls per week – or more than 137 calls annually – were directed at an average consumer before the do-not-call list came into effect. Cf. 68 Fed. Reg. at 44152 (discussing the five-fold increase in the total number of telemarketing calls between 1991 and 2003). Accordingly, absent the do-not-call registry, telemarketers would call those consumers who have already signed up for the registry an estimated total of 6.85 billion times each year.

To be sure, the do-not-call list will not block all of these calls. Nevertheless, it will prohibit a substantial number of them, making it difficult to

- 25 -

fathom how the registry could be called an "ineffective" means of stopping invasive or abusive calls, or a regulation that "furnish[es] only speculative or marginal support" for the government's interests. See also id. (noting the effectiveness of state do-not-call lists in reducing unwanted telemarketing calls).[11]

Furthermore, the do-not-call list prohibits not only a significant number of commercial sales calls, but also a significant percentage of all calls causing the problems that Congress sought to address (whether commercial, charitable or political). The record demonstrates that a substantial share of all solicitation calls will be governed by the do-not-call rules. See H.R. Rep. No. 102-317, at 16 (1991) ("[M]ost unwanted telephone solicitations are commercial in nature."); 68 Fed. Reg. at 44153-54 (the high volume and unexpected nature of commercial calls subject to the national do-not-call registry makes those calls more problematic than nonprofit calls and solicitations based on established business relationships).

---

[11] It is unclear from the record exactly how many telemarketing calls will be blocked by the do-not-call regulations. Most significantly, we have not been provided with data as to how many of these unsolicited sales calls would be permissible under the established business relationship exception. In applying Central Hudson, however, we are entitled to rely on anecdotal evidence and make the common sense observation that the do-not-call list will apply to a substantial number of telemarketing calls. See Went For It, 515 U.S. at 628; cf. 68 Fed. Reg. at 44153-54 (suggesting that the volume of calls exempted under the established business relationship exception most likely will be relatively low compared to the volume of calls subject to the do-not-call restrictions); 68 Fed. Reg. at 4631 (noting that telemarketers expect to lay off up to half of their employees in response to the do-not-call regulations).

The telemarketers asserted before the FTC that they might have to lay off up to 50 percent of their employees if the national do-not-call registry came into effect. See 68 Fed. Reg. at 4631. It is reasonable to conclude that the telemarketers' planned reduction in force corresponds to a decrease in the amount of calls they will make. Significantly, the percentage of unwanted calls that will be prohibited will be even higher than the percentage of all unsolicited calls blocked by the list. The individuals on the do-not-call list have declared that they do not wish to receive unsolicited commercial telemarketing calls, whereas those who do want to continue receiving such calls will not register. Cf. 68 Fed. Reg. at 4632 (under the national do-not-call regulations, "telemarketers would reduce time spent calling consumers who do not want to receive telemarketing calls and would be able to focus their calls only on those who do not object").

Finally, the type of unsolicited calls that the do-not-call list does prohibit – commercial sales calls – is the type that Congress, the FTC and the FCC have all determined to be most to blame for the problems the government is seeking to redress. According to the legislative history accompanying the TCPA, "[c]omplaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations." H.R. Rep. No. 102-317, at 16 (1991) (noting that non-commercial calls were less intrusive to consumers' privacy because they are more expected and because there

- 27 -

is a lower volume of such calls); see also 68 Fed. Reg. at 44153. Similarly, the FCC determined that calls from solicitors with an established business relationship with the recipient are less problematic than other commercial calls. 68 Fed. Reg. at 44154 ("Consumers are more likely to anticipate contacts from companies with whom they have an existing relationship and the volume of such calls will most likely be lower.").

Additionally, the FTC has found that commercial callers are more likely than non-commercial callers to engage in deceptive and abusive practices. 68 Fed. Reg. at 4637 ("When a pure commercial transaction is at stake, callers have an incentive to engage in all the things that telemarketers are hated for. But non-commercial speech is a different matter."). Specifically, the FTC concluded that in charitable and political calls, a significant purpose of the call is to sell a cause, not merely to receive a donation, and that non-commercial callers thus have stronger incentives not to alienate the people they call or to engage in abusive and deceptive practices. Id.; cf. Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980) ("[B]ecause charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it is not dealt with as a variety of purely commercial speech."). The speech regulated by the do-not-call list is therefore the speech most likely to cause the problems the

government sought to alleviate in enacting that list, further demonstrating that the regulation directly advances the government's interests.

In sum, the do-not-call list directly advances the government's interests – reducing intrusions upon consumer privacy and the risk of fraud or abuse – by restricting a substantial number (and also a substantial percentage) of the calls that cause these problems. Unlike the regulations struck down in <u>Rubin</u> and <u>Discovery Network</u>, the do-not-call list is not so underinclusive that it fails materially to advance the government's goals.

### 2. Narrow Tailoring

Although the least restrictive means test is not the test to be used in the commercial speech context, commercial speech regulations do at least have to be "narrowly tailored" and provide a "reasonable fit" between the problem and the solution. Whether or not there are "numerous and obvious less-burdensome alternatives" is a relevant consideration in our narrow tailoring analysis. <u>Went For It</u>, 515 U.S. at 632. A law is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 799 (1989). Accordingly, we consider whether there are numerous and obvious alternatives that would restrict less speech and would serve the government's interest as

effectively as the challenged law. See Central Hudson, 447 U.S. at 565; Edge Broad., 509 U.S. at 430.

We hold that the national do-not-call registry is narrowly tailored because it does not over-regulate protected speech; rather, it restricts only calls that are targeted at unwilling recipients. Cf. Frisby v. Schultz, 487 U.S. 474, 485 (1988) ("There simply is no right to force speech into the home of an unwilling listener."); Rowan v. United States Post Office Dep't, 397 U.S. 728, 738 (1970) ("We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another."). The do-not-call registry prohibits only telemarketing calls aimed at consumers who have affirmatively indicated that they do not want to receive such calls and for whom such calls would constitute an invasion of privacy. See Hill v. Colorado, 530 U.S. 703, 716-17 (2000) (the right of privacy includes an unwilling listener's interest in avoiding unwanted communication).

The Supreme Court has repeatedly held that speech restrictions based on private choice (i.e. – an opt-in feature) are less restrictive than laws that prohibit speech directly. In Rowan, for example, the Court approved a law under which an individual could require a mailer to stop all future mailings if he or she received advertisements that he or she believed to be erotically arousing or sexually provocative. 397 U.S. at 729-30, 738. Although it was the government that

empowered individuals to avoid materials they considered provocative, the Court emphasized that the mailer's right to communicate was circumscribed only by an affirmative act of a householder.  Id. at 738.  "Congress has erected a wall – or more accurately permits a citizen to erect a wall – that no advertiser may penetrate without his acquiescence. ... The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain."  Id.

Likewise, in rejecting direct prohibitions of speech (even fully protected speech), the Supreme Court has often reasoned that an opt-in regulation would have been a less restrictive alternative.  In Martin v. City of Struthers, the Court struck down a city ordinance prohibiting door-to-door canvassing, noting that the government's interest could have been achieved in a less restrictive manner by giving householders the choice of whether or not to receive visitors.  319 U.S. 141, 147-49 (1943) ("[T]he decision as to whether distributers of literature may lawfully call at a home ... belongs ... with the homeowner himself.  A city can punish those who call at a home in defiance of the previously expressed will of the occupant.").[12]  More recently, in Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton, the Court struck down a permit requirement for door-to-door advocacy, while noting that another section of the ordinance allowing

_____

[12]  The Court in Martin suggested that one kind of regulation of home solicitation that would pass constitutional muster would be a regulation "which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed."  319 U.S. at 148.

- 31 -

residents to post "No Solicitation" signs provided ample protection for the unwilling listener. 536 U.S. 150, 153, 168-69 (2002); see also Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 639 (1980) ("[T]he provision permitting homeowners to bar solicitors from their property by posting signs reading 'No Solicitors or Peddlers Invited' suggests the availability of less intrusive and more effective measures to protect privacy.") (citations omitted).

The idea that an opt-in regulation is less restrictive than a direct prohibition of speech applies not only to traditional door-to-door solicitation, but also to regulations seeking to protect the privacy of the home from unwanted intrusions via telephone, television, or the Internet. See United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 815 (2000) (opt-in targeted blocking of offensive television programming "enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners.... Simply put, targeted blocking is less restrictive than banning...."); cf. Reno v. ACLU, 521 U.S. 844, 860, 879 (1997) (striking down an absolute prohibition against making certain sexually explicit material available to minors on the Internet on the grounds that it curtailed the speech of adults, contrasting that regulation with the alternative of facilitating parental control of such material).

Like the do-not-mail regulation approved in <u>Rowan</u>, the national do-not-call registry does not itself prohibit any speech. Instead, it merely "permits a citizen to erect a wall ... that no advertiser may penetrate without his acquiescence." <u>See</u> <u>Rowan</u>, 397 U.S. at 738. Almost by definition, the do-not-call regulations only block calls that would constitute unwanted intrusions into the privacy of consumers who have signed up for the list. Moreover, it allows consumers who feel susceptible to telephone fraud or abuse to ensure that most commercial callers will not have an opportunity to victimize them. Under the circumstances we address in this case, we conclude that the do-not-call registry's opt-in feature renders it a narrowly tailored commercial speech regulation.

The do-not-call registry's narrow tailoring is further demonstrated by the fact that it presents both sellers and consumers with a number of options to make and receive sales offers. From the seller's perspective, the do-not-call registry restricts only one avenue by which solicitors can communicate with consumers who have registered for the list. In particular, the do-not-call regulations do not prevent businesses from corresponding with potential customers by mail or by means of advertising through other media. <u>Cf.</u> <u>Florida Bar v. Went For It, Inc.</u>, 515 U.S. 618, 633-34 (1995) (holding a 30-day post-accident ban on attorney solicitations narrowly tailored, finding it relevant that ample alternative channels for advertising legal services were available).

From the consumer's perspective, the do-not-call rules provide a number of different options allowing consumers to dictate what telemarketing calls they wish to receive and what calls they wish to avoid. Consumers who would like to receive some commercial sales calls but not others can sign up for the national do-not-call registry but give written permission to call to those businesses from whom they wish to receive offers. See 16 C.F.R. § 310.4(b)(1)(iii)(B)(*i*); 47 C.F.R. § 64.1200(f)(9)(i). Alternatively, they may decline to sign up on the national registry but make company-specific do-not-call requests with those particular businesses from whom they do not wish to receive calls. See 16 C.F.R. § 310.4(b)(1)(iii)(A); 47 C.F.R. § 64.1200(d)(3). Therefore, under the current regulations, consumers choose between two default rules – either that telemarketers may call or that they may not. Then, consumers may make company-specific modifications to either of these default rules as they see fit, either granting particular sellers permission to call or blocking calls from certain sellers.

Finally, none of the telemarketers' proposed alternatives would serve the government's interests as effectively as the national do-not-call list. Primarily, the telemarketers suggest that company-specific rules effectively protected consumers. Yet as the FTC found, "[t]he record in this matter overwhelmingly shows the contrary ... it shows that the company-specific approach is seriously

inadequate to protect consumers' privacy from an abusive pattern of calls placed by a seller or telemarketer." 68 Fed. Reg. at 4631.

First, the company-specific approach proved to be extremely burdensome to consumers, who had to repeat their do-not-call requests to every solicitor who called. Id. at 4629. In effect, this system gave solicitors one free chance to call each consumer, although many consumers find even an initial unsolicited sales call abusive and invasive of privacy. Id. at 4629-30; cf. FCC v. Pacifica Found., 438 U.S. 726, 748-49 (1978) ("To say that one may avoid further offense by turning off the radio when he hears indecent language is like saying that the remedy for an assault is to run away after the first blow. One may hang up on an indecent phone call, but that option does not ... avoid a harm that has already taken place."). Second, the government's experience under the company-specific rules demonstrated that commercial solicitors often ignored consumers' requests to be placed on their company-specific lists. 68 Fed. Reg. at 4629. Third, consumers have no way to verify whether their numbers have been removed from a solicitor's calling list in response to a company-specific do-not-call request. Id. Finally, company-specific rules are difficult to enforce because they require consumers to bear the evidentiary burden of keeping lists detailing which telemarketers have called them and what do-not-call requests they have made. Id.

The telemarketers' objection that the company-specific approach should have been more vigorously marketed to consumers is unavailing because the flaws the FTC identified are inherent in the company-specific rule. More consumer education simply could not have cured the ineffectiveness of the former system. Similarly, even if we were to agree with the telemarketers' argument that violations of the company-specific list were not adequately enforced, the national do-not-call program improves upon failures of the company-specific approach that were not caused by any lack of enforcement. Unlike the national registry, the company-specific approach gave a vast number of potential solicitors one shot at each unwilling consumer and was significantly more difficult for consumers to use. Moreover, the national do-not-call registry will be easier to enforce than the company-specific rules because there will generally be no dispute as to whether a certain telemarketer is prohibited from calling a particular number.

Finally, the telemarketers argue that it would have been less restrictive to let consumers rely on technological alternatives – such as caller ID, call rejection services, and electronic devices designed to block unwanted calls. Each of these alternatives puts the cost of avoiding unwanted telemarketing calls on consumers. Furthermore, as the FCC found, "[a]lthough technology has improved to assist consumers in blocking unwanted calls, it has also evolved in such a way as to assist telemarketers in making greater numbers of calls and even circumventing

such blocking technologies." 68 Fed. Reg. at 44147. Forcing consumers to compete in a technological arms race with the telemarketing industry is not an equally effective alternative to the do-not-call registry.

In sum, the do-not-call registry is narrowly tailored to restrict only speech that contributes to the problems the government seeks to redress, namely the intrusion into personal privacy and the risk of fraud and abuse caused by telephone calls that consumers do not welcome into their homes. No calls are restricted unless the recipient has affirmatively declared that he or she does not wish to receive them. Moreover, telemarketers still have the ability to contact consumers in other ways, and consumers have a number of different options in determining what telemarketing calls they will receive. Finally, there are not numerous and obvious less-burdensome alternatives that would restrict less speech while accomplishing the government's objectives equally as well.


C. Discovery Network

As should be clear from the foregoing discussion, the telemarketers' reliance on Discovery Network is misplaced. In Discovery Network, the Supreme Court applied Central Hudson to strike down a municipal policy directly prohibiting freestanding commercial newsracks on public property. 507 U.S. at 412, 416. It concluded that the regulation – which did not similarly restrict non-

commercial newsracks – did not bear a reasonable fit to the city's interests in promoting safety and the attractive appearance of the city's public areas. Id. at 412, 417. In particular, the Court emphasized that 1) the regulation applied to only a "minute" and "paltry" share of the total number of newsracks in the city, id. at 418, and 2) the regulation's distinction between commercial and non-commercial speech bore "no relationship whatsoever to the particular interests that the city has asserted." Id. at 424 (emphasis in original).

The trifling number of newsracks regulated in Discovery Network suggested that the policy did not materially advance the city's interests, and this aspect of the regulation was not justified by evidence demonstrating that despite their small numbers the commercial newsracks disproportionately caused the problems the city sought to remedy. The Court held, in essence, that a regulation that has only a minimal impact on the identified problem cannot be saved simply because it targets only commercial speech, which occupies a lower place in our First Amendment jurisprudence. The Court concluded that the "low value" of commercial speech was "an insufficient justification for the discrimination against respondents' use of newsracks that are no more harmful than the permitted newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks." Id. at 418 (emphasis added). Under a straight-forward

application of <u>Central Hudson</u>, the Court struck down the city's newsrack ordinance because it failed directly to advance the city's interests.

Both of the factors the Court emphasized in <u>Discovery Network</u> are absent in our case. First, while the regulation in <u>Discovery Network</u> applied only to a minute and paltry number of newsracks, the do-not-call registry blocks a substantial amount of unwanted telemarketing calls. <u>See</u> <u>supra</u> part III(B)(1). Second, while the distinction between commercial and non-commercial speech in <u>Discovery Network</u> bore no relationship whatsoever to the city's asserted interests, the do-not-call registry's commercial/non-commercial distinction was based on findings that commercial telephone solicitation was significantly more problematic than charitable or political fundraising calls. <u>Id.</u>; <u>see also</u> <u>FTC v. Mainstream Mktg Servs., Inc.</u>, 345 F.3d 850, 856-60 (10th Cir. 2003). Additionally, the government had evidence that other alternatives (company-specific restrictions) failed in the commercial context, but had no comparable experience involving the failure of company-specific restrictions with respect to charitable or political callers. <u>See</u> <u>supra</u> part III(B)(2); 68 Fed. Reg. at 4637.

### D.  Summary

For the reasons discussed above, the government has asserted substantial interests to be served by the do-not-call registry (privacy and consumer

protection), the do-not-call registry will directly advance those interests by banning a substantial amount of unwanted telemarketing calls, and the regulation is narrowly tailored because its opt-in feature ensures that it does not restrict any speech directed at a willing listener. In other words, the do-not-call registry bears a reasonable fit with the purposes the government sought to advance. Therefore, it is consistent with the limits the First Amendment imposes on laws restricting commercial speech.[13]

## IV. OTHER ISSUES

The telemarketers also challenge various other aspects of the do-not-call registry. In turn, we consider 1) whether the fees telemarketers must pay to access the registry are constitutional, 2) whether it was arbitrary and capricious for the FCC to approve the established business relationship exception, and 3) whether the FTC had statutory authority to enact its do-not-call rules.[14]

---

[13] Our conclusion is consistent with other circuits' decisions approving similar telecommunications regulations. See Missouri v. American Blast Fax, Inc., 323 F.3d 649 (8th Cir. 2003) (upholding TCPA regulation prohibiting unsolicited commercial fax advertising); Destination Ventures, Ltd., v. FCC, 46 F.3d 54 (9th Cir. 1995) (same); Moser v. FCC, 46 F.3d 970, 972-75 (9th Cir. 1995) (upholding ban on prerecorded commercial telemarketing).

[14] The telemarketers' challenge to the do-not-call registry fees was raised below in case No. 03-1429, although the district court did not reach this issue.

(continued...)

A.  The Do-Not-Call Registry Fees

To obtain the phone numbers of consumers who have signed up for the national do-not-call registry, telemarketers must pay a modest annual access fee determined by the FTC.  Currently, the fee is $25 per area code of data, except that the first five area codes are provided free of charge and the maximum annual fee is capped at $7,375. 16 C.F.R. § 310.8(c).  The telemarketers argue that this fee unconstitutionally imposes a revenue tax on protected speech.  We disagree.

It is well-established that the First Amendment protects against the imposition of charges, such as a license taxes, for the enjoyment of free speech rights.  Murdock v. Pennsylvania, 319 U.S. 105, 113-14 (1943).  Nevertheless, the government is permitted to exact a fee in order to defray the cost of legitimate regulations, even though such a fee incidentally burdens speech.  See id. at 114 n.8.  In Murdock, for example, the Court struck down an ordinance that required Jehovah's Witnesses to pay licensing fees in order to distribute religious materials door-to-door, explaining that the regulation was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question."

---

[14](...continued)
The challenge to the FCC's established business relationship exception has been raised only in case No. 03-9594, in which we review the FCC action directly.  The telemarketers' challenge to the FTC's statutory authority to enact its do-not-call regulations was raised below in case Nos. 03-1429 and 03-6258.  In case No. 03-1429, the district court declined to reach this issue; in case No. 03-6258, the district court held that the FTC lacked statutory authority.

Id. at 106, 113-14. The Court employed the same reasoning in Cox v. New Hampshire, upholding license fees of up to $300 to take part in a parade or procession because the fee was held "to be not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." 312 U.S. 569, 570-71, 576-77 (1941).

Accordingly, we recently approved the Utah Charitable Solicitations Act – which requires charitable fundraisers to register with the state and pay $250 for a permit – because that fee offsets increased regulatory costs associated with the act. American Target Adver., Inc. v. Giani, 199 F.3d 1241, 1246, 1248-49 (10th Cir. 2000). We held that "a regulatory fee may be constitutional only if it serves a 'legitimate state interest'" and that defraying the costs of a regulation aimed at protecting citizens from fraud is legitimate. Id. at 1248-49. Such fees may be imposed to defray both administrative expenses (such as processing and licensing costs) and the cost of enforcing the regulations. National Awareness Found. v. Abrams, 50 F.3d 1159, 1166 (2d Cir. 1995) ("[E]nforcement power is necessary to ensure that the purposes of [the regulations] are served.").

The Do-Not-Call Implementation Act authorized the FTC to collect fees for fiscal years 2003 to 2007, requiring that "[s]uch amounts shall be available for expenditure only to offset the costs of activities and services related to the implementation and enforcement of the Telemarketing Sales Rule, and other

activities resulting from such implementation and enforcement." Pub. L No. 108-10, 117 Stat. 557 at § 2 (2003). In enacting the fees regulation, the FTC stated it was authorized only "to assess fees sufficient to cover the costs of implementing and enforcing the do-not-call provisions of the Amended TSR." Telemarketing Sales Rule Fees, 68 Fed. Reg. 45134, 45141 (July 31, 2003). The FTC estimated the costs of implementing and enforcing the national do-not-call registry at $18.1 million for fiscal year 2003. Id.

The record conclusively demonstrates that the do-not-call registry fees are to be used only to pay for expenses incident to the administration of the do-not-call registry, as required by Murdock and Giani. The FTC explained that the costs of the do-not-call registry fall into three major categories. First are the actual costs of developing and operating the national registry, such as the costs of handling consumer registration and complaints, transferring information from state lists to the registry, ensuring telemarketer access to the registry, and managing law enforcement access to appropriate information. Id. Second are the costs of enforcement efforts, such as domestic and international law enforcement initiatives to identify and challenge alleged violators, and consumer and business education efforts. Id. Third are the increased costs of agency infrastructure and administration, including changes in information technology structural support necessary to handle anticipated increases in consumer complaints and requests

from law enforcement agencies for access to such complaints.  Id.  The FTC decided upon the $25 per area code fee in order to ensure that it would collect the amount necessary to defray these costs.[15]

Therefore, we hold that the registry fees are a permissible regulatory measure designed to offset projected expenses incident to the administration and enforcement of the national do-not-call list, not an unconstitutional revenue tax.


### B.  The Established Business Relationship Exception

The telemarketers next argue that the FCC's established business relationship exception is arbitrary and capricious in violation of the Administrative Procedure Act.  See 5 U.S.C. § 706.  In particular, they contend that the FCC failed to give appropriate consideration to the anti-competitive effect that this exception may have on telecommunications markets.  We conclude that the FCC did in fact address this concern, and that the FCC's exception for established business relationships is not arbitrary and capricious under the APA.

---

[15]  First, the FTC estimated that about 10,000 telemarketing firms would seek access to the list, and that the average telemarketer would pay to obtain about 73 area codes of data.  68 Fed. Reg. at 45141.  Under those estimates, the expenses incident to the list would amount to about $25 per area code provided, excluding those that would be provided free of charge. Recognizing that its fee schedule is based on estimated figures, the FTC also emphasized that these fees would need to be reexamined periodically and adjusted to reflect the FTC's actual experience in operating the registry.  Id. at 45141-42.

The arbitrary and capricious standard of review is a narrow one, and we are not empowered to substitute our own judgment for that of the administrative agency. City of Albuquerque v. Browner, 97 F.3d 415, 424 (10th Cir. 1996). "Generally, an agency decision will be considered arbitrary and capricious if 'the agency had relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)).

The Telecommunications Act of 1996, 47 U.S.C. § 251 et. seq., required local telephone monopolies to make their facilities and services available to competitors for negotiated or arbitrated prices, and directed the FCC to establish regulations to advance local competition. The FCC enacted its do-not-call rules under different statutory authority, the TCPA, which specifically authorized the FCC to establish a national database of residential telephone subscribers who object to receiving telephone solicitations. See 47 U.S.C. § 227(c)(3).

When an agency is charged to enforce overlapping and at times inconsistent policies, it cannot act single-mindedly in furtherance of one of those policies

- 45 -

while wholly ignoring the other. Southern S.S. Co. v. NLRB, 316 U.S. 31, 46-47 (1942); McLean Trucking Co. v. United States, 321 U.S. 67, 80 (1944).

The FCC rule sufficiently addresses the telemarketers' concerns about the established business relationship exception. In its notice of rulemaking, the FCC asked for comments on the anti-competitive effect this exception might have on the telecommunications industry. See 68 Fed. Reg. at 44159. The FCC received responses indicating that such an exception would favor incumbent telephone service providers who would be able to market new services to their larger customer base. Id. at 44159-60. Also, the FCC noted some respondents' concerns that this anti-competitive effect would be particularly strong because telephone solicitations are currently the primary mechanism for selling telecommunications services. Id. at 44159. The FCC then considered several proposed ways in which such an anti-competitive effect could be mitigated, rejecting each of them.

First, the FCC considered a proposal to narrow the established business relationship exemption so that no telecommunications company could call its customers to advertise different services. Id. at 44160. However, the FCC cited comments in its administrative record emphasizing the importance of "flexibility in communicating with ... customers not only about their current services, but also to discuss available alternative services or products." Id. Accordingly, the FCC

concluded that limiting telecommunications companies' ability to market new goods or services to existing customers would not be in the public interest.  Id.

Second, the FCC considered a proposal that the Commission revise the definition of established business relationship so that all providers of telecommunications services would be deemed to have such a relationship with all consumers, even if they had not in fact had any preexisting business connections. Id.  Third, it considered an alternative proposal that the definition of established business relationship be revised to exclude companies who have historically been dominant or monopoly service providers, at least until such time as the new entrants to the telecommunications industry sufficiently penetrated the market. Id.  The FCC concluded that these proposals would not adequately fulfill Congress' mandate to protect residential telephone subscribers' privacy rights to avoid telemarketing calls to which they object: "To permit common carriers to call consumers with whom they have no existing relationships and who have expressed a desire not to be called by registering with the national do-not-call list, would likely confuse consumers and interfere with their ability to manage and monitor the telemarketing calls they receive." Id.

The FCC then explained the factors it believed would limit the established business relationship exception's anti-competitive effect.  First, it noted that all providers of  telecommunications services – incumbent carriers and new

competitors alike – may contact competitors' customers who have not signed up for the national do-not-call registry.  Id.  Second, consumers who have signed up for the do-not-call registry still have the ability to place their carrier on a company-specific do-not-call list, thereby overriding the established business relationship exception.  Id.  Finally, the FCC emphasized that telecommunications providers are still free to use other means of marketing their products to consumers, such as direct mailings.  Id.

The FCC's rule demonstrates that the agency did not simply ignore the potential anti-competitive effect of the established business relationship exception or its duties under the Telecommunications Act.  Rather, the FCC analyzed the possible effects that this exception may have on the telecommunications industry and explained why it believed its rule would minimize any adverse consequences. When an agency has made a reasoned policy decision, "we are not empowered to substitute our judgment for that of the [agency]" under the arbitrary and capricious standard of review.  Browner, 97 F.3d at 424.  The FCC did not act in an arbitrary and capricious manner in adopting the established business relationship exception, and we decline the telemarketers' invitation to displace the FCC's policy judgment.

C. The FTC's Statutory Authority

In case No. 03-6258, the district court held that the FTC lacked statutory authority to enact the do-not-call registry. In the Telemarketing Act, Congress authorized the FTC to "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." Pub. L. 103-297, 108 Stat. 1545 at § 3. More specifically, Congress directed the FTC to include "a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." Id. The FTC's conclusion that this language authorized it to enact the national do-not-call registry is entitled to deference under the familiar test outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council. 467 U.S. 837, 842-43 (1984).[16] In light of this deference, we conclude that the FTC did have statutory authority to promulgate its do-not-call regulations because the agency's view that the Telemarketing Act authorized it to enact those rules is at least a permissible construction of that statute.

---

[16] In reviewing an agency's construction of a statute it administers, we first ask whether Congress has directly spoken to the precise question at issue. If so, that is the end of the matter and Congress' intent controls. If the statute is silent or ambiguous with respect to this issue, our inquiry is limited to whether the agency's interpretation is a permissible construction of the statute. Chevron, 467 U.S. at 842-43.

- 49 -

Moreover, even if some doubt once existed, Congress erased it through subsequent legislation.  See North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 535 (1982) ("Where an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned."); Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir. 2002) ("Congress may ratify agency conduct 'giving the force of law to official action unauthorized when taken.'") (citing Swayne & Hoyt v. United States, 300 U.S. 297, 302 (1937)).  In the Do-Not-Call Implementation Act, Congress directed the FCC and FTC to maximize consistency between their respective do-not-call rules and authorized the FTC to collect do-not-call registry fees to offset the administrative costs of the regulations.  Pub. L. 108-10, 117 Stat. 557 at §§ 2-3.  Furthermore, in response to the district court's decision in case No. 03-6258, Congress expressly ratified the FTC's do-not-call regulations.  An Act to Ratify the Authority of the Federal Trade Commission to Establish a Do-Not-Call Registry, Pub. L. 108-82, 117 Stat 1006 (2003).  The FTC's statutory authority is now unmistakably clear.

## V. CONCLUSION

We hold that 1) the do-not-call list is a valid commercial speech regulation under <u>Central Hudson</u> because it directly advances substantial governmental interests and is narrowly tailored; 2) the registry fees telemarketers must pay to access the list are a permissible measure designed to defray the cost of legitimate government regulation; 3) it was not arbitrary and capricious for the FCC to adopt the established business relationship exception; and 4) the FTC has statutory authority to establish and implement the national do-not-call registry.

The judgments below in cases 03-1429 and 03-6258 are REVERSED with respect to the questions presented in this appeal, and the petitions for review in cases 03-9571 and 03-9594 are DENIED.