In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3995

NATIONAL COALITION OF PRAYER, INC.,
THE KENTUCKY-INDIANA CHAPTER OF PARALYZED
VETERANS OF AMERICA, INDIANA TROOPERS
ASSOCIATION, INC., and INDIANA ASSOCIATION OF
CHIEFS OF POLICE FOUNDATION,

*Plaintiffs-Appellants,*

*v.*

STEVE CARTER, in his official capacity as
Attorney General of the State of Indiana,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP02-C-0536-B/S—**Sarah Evans Barker**, *Judge.*

ARGUED MAY 3, 2006—DECIDED JULY 28, 2006

Before FLAUM, *Chief Judge*, and EVANS and WILLIAMS,
*Circuit Judges.*

FLAUM, *Chief Judge.* Plaintiffs are charities that Indiana's Telephone Privacy Act ("the Act") precludes from fundraising through professional telemarketers. They claim that the Act violates their First Amendment right to freedom of speech because it is content-based, underbroad, and a prior restraint on speech. The district court

granted summary judgment to the State, and Plaintiffs now appeal. For the following reasons, we affirm the decision of the district court.

## I. Background

In May 2001, Indiana's governor signed into law the Indiana Telephone Privacy Act, codified at Indiana Code § 24-4.7. The Act creates a statewide do-not-call list and allows Indiana residential telephone customers to add themselves to this list. Once citizens affirmatively place their telephone numbers on the list, "telephone solicitors" cannot legally call the numbers for a "telephone sales call." The Act defines a "telephone solicitor" as "an individual, a firm, an organization, a partnership, an association, or a corporation . . . doing business in Indiana." Ind. Code § 24-4.7-2-10. A "telephone sales call" is any call made to "solicit[]" a "sale of consumer goods or services" or a "charitable contribution," or to "obtain[] information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Ind. Code § 24-4.7-2-9.

The Act exempts certain calls from its purview. Most relevant to this case, the Act permits "telephone call[s] made on behalf of a charitable organization that is exempt from federal income taxation under Section 501 of the Internal Revenue Code, but only if . . . [t]he telephone call is made by a volunteer or an employee of the charitable organization[, and] the telephone solicitor who makes the telephone call immediately discloses . . . [his or her] true first and last name [and t]he name, address, and telephone number of the charitable organization." Ind. Code § 24-4.7-1-1(3). The Act also exempts calls soliciting newspaper sales, if the calls are made by an employee of or volunteer for the newspaper company. Ind. Code § 24-4.7-1-1(6). Finally, the Act permits a licensed real estate agent or

insurance agent to personally call registered numbers under specified circumstances. Ind. Code § 24-4.7-1-1(4) - (5). The Indiana Attorney General has also recognized an "implicit exclusion" for calls soliciting political contributions.

The State asserts that the Act was prompted by citizen complaints about telemarketers' increasing intrusions on residential privacy. According to one witness in a state court trial concerning the Act, during a single four-hour shift over the course of a month, her telemarketing company alone could make up to 16,000 telephone calls. Many Indiana residents found the calls to be an invasion of the tranquility and privacy of their homes. The State has produced several affidavits from such residents that support this observation. The legislature believed its initial response to curb unwanted calls—requiring citizens to tell each individual telemarketing firm to take their names off of the firm's call list—had proven ineffective. Accordingly, it passed the Act to give homeowners a more effective method of preventing unwanted and intrusive calls. The Act became effective on January 1, 2002, approximately seven months after the governor signed it into law. Later that month, Indiana commissioned a professional survey to study the Act's efficacy. That survey reflects that calls to numbers registered on the do-not-call list dropped from an average of 12.1 per week to an average of 1.9 per week. Nearly 98% of the residents who had registered their telephone numbers reported receiving "less" or "much less" telemarketing interruption since the Act became law. In June 2003, the surveyors concluded that the Act had been effective in reducing the volume of unwanted calls to Indiana homes. Indeed, by May 2003, about half of Indiana's residential lines had been registered on the state's do-not-call list. By late 2005, another 500,000 numbers had been added.

The Plaintiffs in this case are all tax-exempt charities. They wish to use telemarketers to solicit donations for their charitable causes. They claim that the Act violates their First Amendment rights, because it prohibits them from using telemarketers to call the numbers registered on the do-not-call list. On cross motions for summary judgment, the district court found in favor of the State, and Plaintiffs now appeal.

## II.  Discussion

### A.  Standing

The first issue we must address is which portions of the Act Plaintiffs have standing to challenge. Plaintiffs claim that they may challenge the entire Act, even the provisions applicable only to commercial speakers, while the State claims that Plaintiffs may challenge only provisions that could be enforced against them. Plaintiffs' arguments fall into two main categories: that the provisions aimed at commercial speakers show the "real purpose" of the Act, and that commercial speakers may not be treated more favorably than charitable speakers.

The "real purpose" line of argument is easier to dispose of. Plaintiffs' argument is essentially that the exemptions in the Act for certain commercial speakers and political fundraising directly injure the Plaintiffs because they show the "true motive behind the Act, i.e. to suppress 'reviled' speakers *vis a vis* more favored speakers." To support this argument, the Plaintiffs cite the Supreme Court's decision in *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993). In that case, Cincinnati had passed a law regulating only commercial newsracks, which represented 62 of the over 1,500 newsracks on the city's streets. *Discovery Network*, 507 U.S. at 418. The Court held that the exception for non-commercial handbills in the Cincinnati ordinance bore no relationship to the city's asserted interests in

passing the regulation, and was so broad as to render the legislation ineffective. *Id.* at 424-28. Therefore, the Court held, the ordinance was an impermissible means of addressing a legitimate public interest. *Id.* The Plaintiffs claim that this holding reflects that exceptions within an ordinance can show an impermissible "true reason" behind legislation, and any disfavored plaintiff can request that the Act be invalidated on that basis.

*Discovery Network* does not hold that exceptions to rules can reveal the "real purpose" of an act or that this "real purpose" can directly injure anyone. The case instead stands for the proposition that commercial speech cannot lightly be singled out as "less valuable" than other speech, and that restrictions on commercial speech, like restrictions on "core" First Amendment speech, must directly further a legitimate state interest. In this case, the Act's restrictions *do* bear a direct relationship to the state's interest in preventing unwanted phone calls. The State's research, the validity of which Plaintiffs do not contest, shows that professional telemarketing firms' calls apparently constituted the vast majority of unwanted phone calls that consumers were receiving. The Act has caused registered households to receive on average about 84% fewer unwanted calls, which amounts to approximately ten fewer unwanted calls per week. This is in stark contrast to the ordinance in *Discovery Network*, which regulated less than five percent of the newsracks that Cincinnati claimed were cluttering up its streets. *Id.* at 418. *Discovery Network* does not create the new form of standing that the Plaintiffs advocate, and is factually distinguishable in any event.

Plaintiffs also claim that they must have standing to assert commercial speakers' interests, because such speakers can have standing to assert non-commercial speakers' rights in certain First Amendment challenges. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973). The Plaintiffs claim that this case is the converse—a non-

commercial speaker challenging on behalf of a commercial speaker. The Plaintiffs therefore ask us to extend the this First Amendment standing analysis to the situation before us.

Plaintiffs' argument does not reflect the logical converse of the holdings in the cases they cite, but more importantly, the argument ignores the policy reasons behind the Court's First Amendment standing doctrine. Commercial speakers have ample incentive to challenge the Act as it applies to them, unlike some speakers who might instead be "muted and [leave their] perceived grievances . . . to fester." *Broadrick,* 413 U.S. at 612. We therefore believe that they are the appropriate people to challenge such restrictions.[1]

Plaintiffs also argue that by refusing to grant them standing in this case, we are necessarily treating commercial speakers more favorably than non-commercial speakers, which they believe is directly contrary to Supreme Court precedent. We are not persuaded by this argument. The reason that commercial speakers are allowed to assert standing for non-commercial speakers is because we presume that speech accorded greater protection will create a stronger case against regulation. *See, e.g.*, *Broadrick,* 413 U.S. at 612 ("In some cases, it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted . . ."). Charities, whose commercial speech enjoys enhanced First Amendment protection, *see Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), already possess a stronger First Amendment claim than

---

[1] At least one group of commercial speakers has already unsuccessfully challenged the National Do Not Call List. *See Mainstream Mktg. Servs., Inc. v. Fed. Trade Comm'n*, 358 F.3d 1228 (10th Cir. 2004).

commercial speakers. By being allowed to bring the Plaintiffs' claim, commercial speakers would be treated the same as the Plaintiffs and no better.

Since the Plaintiffs' arguments that they have standing to assert commercial speakers' interests fail, we, like the district court, will address only those arguments that apply to Plaintiffs' own speech.

## B.  Merits of the First Amendment Claim

The parties disagree about which method of First Amendment analysis is most appropriate in this case. The Plaintiffs argue that the Act is a content-based regulation that should be subjected to strict scrutiny. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000) (citing *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)) (setting out strict scrutiny standard for content-based speech restrictions). The State advances a less traditional method of analysis based on the Supreme Court's decisions in *Rowan v. United States Postal Service,* 397 U.S. 728 (1970), and *Hill v. Colorado*, 530 U.S. 703 (2000). Under the State's theory, because of the "opt in" nature of the Act, we need only determine that the State's interest in maintaining residential privacy for Indiana citizens outweighs the speaker's right to communicate his or her message into private homes.

The State's argument is primarily based on *Rowan*. In that case, the Supreme Court reviewed a law that allowed customers of the U.S. Postal Service to prohibit delivery of sales literature for items "which the addressee in his sole discretion believes to be erotically arousing or sexually provocative." The Court upheld the statute, citing the need for a person to be safe from any unwanted message—even a "valid message"—in his or her own home. Because the homeowner had to take an affirmative act to prohibit mailings, the Court wrote:

> [I]t seems to us that a mailer's right to communicate must stop at the mailbox of the unreceptive addressee. . . . To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit[.]

*Rowan,* 397 U.S. at 736-37. The *Rowan* Court went on to state, "In effect, Congress has erected a wall—or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence. . . . [T]he citizen cannot be put to the burden of determining on repeated occasions whether the offending mailer has altered its material so as to make it acceptable." *Id.* at 738. Most tellingly, the Court directly held, "We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. . . . [N]o one has a right to press even 'good' ideas on an unwilling recipient." *Id.* The State argues that the do-not-call list similarly insulates people in their own homes from unwanted messages, and similarly requires residents to take affirmative steps before doing so.

Certain trial courts have found *Rowan* inapplicable to do-not-call lists, however. For example, when the district court of Colorado heard an early challenge to the national do-not-call list in *Mainstream Marketing, Inc. v. Federal Trade Commission*, 283 F. Supp. 2d 1151 (D. Colo. 2003), *rev'd,* 358 F.3d 1228 (10th Cir. 2004), it found that, unlike the statute in *Rowan*, the national do-not-call registry exempted certain callers, such as charities, from the list. This exemption, the district court believed, removed discretion from the consumer in a manner that the statute in *Rowan* did not and consequently *increased* the government's

discretion to decide which speech was prohibited. *Id.* (analyzing the claim as a content-based restriction of commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980)). A district court in North Dakota did not apply *Rowan* to North Dakota's do-not-call list based on similar reasoning. *Fraternal Order of Police v. Stenehjem*, 287 F. Supp. 2d 1023 (D.N.D. 2003) (evaluating the case under the charitable speech standard articulated in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980)), *rev'd*, 431 F.3d 591 (8th Cir. 2005). Neither the Eighth Circuit nor the Tenth Circuit directly addressed a *Rowan* argument similar to the one the State presses here. Instead, they reversed by employing more standard First Amendment analysis.

We find the State's *Rowan* analogy persuasive, and choose to adopt it here. We agree with the aforementioned district courts that the Supreme Court's reservations about a prior version of the act at issue in *Rowan* could be relevant to our analysis here. The act that the *Rowan* court upheld allowed a postal customer to block all future mailings from a sender after determining that any single mailing from the sender was "erotically arousing or sexually provocative." A prior version of that act would have allowed the Postmaster General to review all future mailings from the sender to determine if they fell within a proscribed class of "pandering advertisements," and override a consumer's wishes not to receive mailings that the Postmaster determined did not fall into that category. *Rowan*, 397 U.S. at 732-33. The Court distinguished the prior version from the final version, emphasizing that the final version allowed "the addressee complete and unfettered discretion in electing whether or not he desired to receive further material from a particular sender." *Id.*

The Court wrote that although the act was acceptable in its final form, its first form would have been more

problematic. Forcing the Postmaster to decide which of a sender's mailings were "similar" to the ones that had prompted the addressee's objection and to continue delivering all other mailings was "open to at least two criticisms." *Id.* at 735. The first is that it would potentially expose the addressee to future unwanted mail; the second was that it would "interpose the Postmaster General between the sender and the addressee and, at the least, create the appearance if not the substance of governmental censorship." *Id.*

The *Rowan* Court's discussion of legislative history of the act at issue in that case lends a degree of support to the district courts' view that *Rowan* is inapplicable whenever a resident does not have the complete discretion to block any form of unwanted communication through a given medium. We believe that this was not the Supreme Court's intent, however. Most persuasively, in footnote 4, during the discussion of the potential problems with the old version of the act, the *Rowan* Court wrote,

> Subsection (d) [of the version of the act that was later upheld] vests the Postmaster General with the duty to determine whether the sender has violated the order. This determination was intended to be primarily a ministerial one involving an adjudication of whether the initial material was an advertisement and whether the sender mailed materials to the addressee more than 30 days after the receipt of the prohibitory order. An interpretation which requires the Postmaster General to determine whether the subsequent material was pandering and/or similar would tend to place him "astride the flow of mail."

*Id.* at 735 n.4 (citing *Lamont v. Postmaster General*, 381 U.S. 301, 306 (1965)).

We conclude that the Act places the Attorney General of Indiana in a "ministerial" role more analogous to that of

the Postmaster General in the final legislation in *Rowan* than that act's objectionable predecessor. The telephone calls that the Attorney General must allow to be placed to numbers on the do-not-call list are very well defined. For example, it involves little discretion to decide if the call was placed on behalf of a tax-exempt charity, or if the person who placed the call was a volunteer or employee of that charity. We therefore disagree with the view that *Rowan* is inapplicable merely because the Act imposes well-defined restrictions on precisely what protections from unwanted communication a residential phone customer may receive by opting in to the do-not-call list.[2]

We respectfully disagree with our concurring colleague that *Rowan* analysis has been displaced by subsequent Supreme Court authority creating frameworks for evaluating commercial and charitable speech. The Supreme Court has never disavowed *Rowan*. While the Court has subsequently cited the case primarily as authority for the state's great interest in protecting residential privacy, we believe that this is because subsequent cases have not presented the appropriate venue for *Rowan* analysis, namely an opt-in statute that applies only to private residences in a manner that effectively protects residential privacy. Most notably, in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980), the case that our concurring

---

[2] Although the concurrence criticizes this reasoning, we believe that concerns regarding the scope of exceptions to the statute are actually concerns about whether the statute is underbroad, and should be evaluated accordingly. As we discuss *infra*, we do not find the Act to be underbroad. Our reading of *Rowan's* footnote four convinces us that the Court wished to avoid placing unbridled discretion in a government official: the Postmaster General. The Attorney General of Indiana does not have similar unbridled and potentially censorial discretion when enforcing the Act, which is why we view his role as "ministerial."

colleague would have us apply here, the Court evaluated an ordinance that would forbid certain charities from soliciting door-to-door *or on public streets*. The Court specifically noted that the statute was "not directed to the unique privacy interests of persons residing in their homes because it applies not only to door-to-door solicitation, but also to solicitation on public streets and public ways." *Vill. of Schaumburg*, 444 U.S. at 638-39 (internal quotation marks omitted).

We agree that the Supreme Court has found that statutes are not narrowly tailored when they prohibit speech to all residences where it is feasible to allow only those households who do not wish to receive the speech to opt in to privacy protection. *See, e.g.*, *Playboy Entm't Group, Inc.*, 529 U.S. at 814-15 (noting that blocking certain channels to all cable subscribers is unnecessarily restrictive, as the subscribers who did not wish to receive these channels could opt out of receiving them). However, we find no evidence that the Court has determined that *Rowan's* authority only extends to narrow tailoring analysis. It is indeed rare that a legislature enacts an opt-in statute that effectively yet narrowly protects residential privacy. While concluding that *Rowan* remains binding precedent, we recognize that it is correctly applied only in limited circumstances.

Once we have decided to apply the *Rowan* analysis, it would seem the case is resolved, since the Supreme Court has already made clear that citizens in their own homes have a stronger interest in being free from unwanted communication than a speaker has in speaking in a manner that invades residential privacy.[3] However, the Plaintiffs

---

[3] We acknowledge that an act that severely impinged on core First Amendment values, such as an opt-in list that allowed
(continued...)

strenuously argue that the Act is underbroad and therefore prohibited under *Discovery Network*. We agree that if the Act was so underbroad as to fail to materially advance the State's interest in residential privacy, Plaintiffs might prevail even under *Rowan*.[4] As discussed briefly in reference to standing, however, we believe that Indiana has shown that the Act's exceptions bear a legitimate relationship to the important government purpose of protecting residential privacy.

Aside from the results of the State's survey discussed previously, we also conclude that the Act's legitimacy

---

[3] (...continued)

homeowners to block calls from only one side of a political debate, might not survive a *Rowan* balancing test. That is not the case before us, however, and thus we need not address when precisely *Rowan's* balancing of the interests begins to tilt in favor of speakers. We are satisfied that all the communications prohibited in this case are similar to those that were outweighed by citizens' interests in residential privacy in *Rowan*.

[4] This was the case in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir. 1998). In that case, the statute in question forbade real estate agents from "solicit[ing] an owner of residential property to sell or list such residential property at any time after such person or corporation has notice that such owner does not desire to sell such residential property." *Pearson*, 153 F.3d 399. Notably, this statute does not limit its ban to times when the homeowner is inside the home that he or she owns. Perhaps that is why the district court in that case found that the state had produced "no evidence . . . that real estate solicitation harms or threatens to harm residential privacy." *Id.* at 404. We noted in that case that the *Rowan* test was not applicable to such an underbroad statute, even though the statute was of an opt in nature. *Id.* at 404 ("Here the state, not the homeowner, has made the distinction between real estate solicitations and other solicitations *without a logical privacy-based reason*." (emphasis added)). Therefore, we cannot agree with our concurring colleague that *Pearson* rejected the *Rowan* framework with respect to an opt-in statute that is not underbroad and is confined to communications aimed solely at a residence.

is bolstered by the Supreme Court's holding in *Hill v. Colorado*, 530 U.S. 703 (2000). In that case, the Court upheld a Colorado statute that criminalized knowingly approaching within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . ." within designated areas surrounding health care clinics. *Hill*, 530 U.S. at 706. The law was intended to protect women seeking to have an abortion from un- wanted encounters with abortion protestors. The Court upheld the law, stating, "[T]he statute's restriction seeks to protect those who enter a health care facility from the harassment . . . that can accompany an unwelcome ap- proach. . . . The statutory phrases, 'oral protest, education, and counseling,' distinguish speech activities likely to have those consequences from those that are most unlikely to have those consequences." *Id.* at 724.

The Indiana legislature passed the Act in order to preserve residential privacy, which was being invaded by the sheer volume of calls inundating homes on a daily basis. This inundation could quite reasonably have been deter- mined to occur when commercial motivation joins forces with a professional telemarketer possessing the technology and capacity to call thousands of people in a relatively short period of time. Allowing charities to place calls with only employees or volunteers, who will likely not place the large volume of calls that a professional telemarketer can place, would seem merely to reflect the legislature's judgment of the limited intrusion the exception poses to residential privacy. It would seem anomalous to strike down a law because the legislature fostered as much speech as possible while still effectively protecting a state interest.

Furthermore, we are mindful that if an ordinance is to regulate any speech, it must be able to withstand a First Amendment challenge. To that end, it is not surprising that

the Indiana Attorney General has fashioned an "implicit exception" for political speech, even if that speech comes from professional telemarketers. Political speech has long been considered the touchstone of First Amendment protection in Supreme Court jurisprudence, and courts are prone to strike down legislation that attempts to regulate it. *See, e.g.*, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) ("But the First Amendment requires us to be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas."); *Roth v. United States*, 354 U.S. 476, 484 (1957) (The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.") For example, in *Meyer v. Grant*, 486 U.S. 414 (1988), the Supreme Court struck down a law that prohibited Colorado citizens from paying individuals to circulate petitions for ballot initiatives. The Court believed that the law "limit[ed] the number of voices who will convey appellees' message and therefore . . . limits the size of the audience that they can reach." *Id.* at 422-23.

The other exceptions in the Act similarly exclude speech from the Act's purview that is less likely to cause invasions of privacy and more likely to create a valid First Amendment claim. Charitable speech is afforded heightened First Amendment protection, as both parties in this case acknowledge. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980). Newspapers have traditionally been a major forum for political speech and are at the heart of the historical justification for freedom of the press, and courts view with skepticism any law that could have a significantly damaging impact on the Fourth Estate. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) (invalidating tax on ink that imposed a significant burden on newspapers as a violation of First Amendment freedom of the press). The

appellants themselves claim that the newspaper exception was added to the Act in response to the revelation that the Indianapolis Star received between 30 and 70 percent of its subscriptions and renewals from telemarketing. Real estate and insurance agents are also permitted to personally convey their commercial messages to customers under limited circumstances, because, as individuals directly communicating their own ideas, those professionals would have a stronger case for arguing prior restraint of speech. Since their calls must by nature be made by one individual, their intrusions are much less likely to significantly burden residents' privacy than the voluminous calls a telemarketing firm could make.

Because the Act sharply curtails telemarketing—the speech that was most injurious to residential privacy—while excluding speech that historically enjoys greater First Amendment protection, we are satisfied that the Act is not underbroad. Therefore, applying *Rowan*, we believe that the state's interest in protecting residents' right not to endure unwanted speech in their own homes outweighs any First Amendment interests the Plaintiffs possess.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for the State of Indiana and its denial of the Plaintiffs' motion for summary judgment.

WILLIAMS, *Circuit Judge*, concurring. I agree that the Indiana Act survives constitutional scrutiny. I write separately because I respectfully disagree with the majority's application of *Rowan v. United States Post Office Dep't*, 397 U.S. 728 (1970). Specifically, I disagree with the majority's conclusion that *Rowan* compels the application of a stand-alone test that requires nothing more than a balancing of the parties' interests. Because I believe that *Rowan* must be read in the context of subsequent Supreme Court authority, which established that a regulation affecting charitable speech must be narrowly tailored to advance a substantial governmental interest, I disagree with the majority's reliance on a test that circumvents this firmly-established narrow-tailoring requirement. *See, e.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (establishing the applicable First Amendment test for regulations affecting charitable speech). Neither *Rowan* nor subsequent case law compels such a departure from bedrock constitutional principles pertaining to charitable speech. Accordingly, I would apply the traditional First Amendment test in this case, under which, as described below, the Indiana Act survives in any event.

As the majority recognizes, charitable speech is entitled to heightened constitutional protections. Beginning in 1980—ten years after the *Rowan* decision—the Supreme Court issued a trilogy of cases that clarified the heightened First Amendment protections applicable to charitable speech. *See Vill. of Schaumburg*, 444 U.S. at 636-38; *Sec'y of State of Md. v. Joseph H. Munson Co., Inc. ("Munson")*, 467 U.S. 947, 960-61 (1984); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 787-92 (1988). In these cases, the Supreme Court unambiguously held that charitable speech, including charitable solicitations, is not commercial speech and is therefore not subject to the lower (but none-theless substantial) First Amendment protections provided for commercial speech. *See, e.g.*, *Vill. of Schaumburg*, 444

U.S. at 632-33. Instead, charitable solicitations are fully protected because they are "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.* at 632; *see also Gresham v. Peterson,* 225 F.3d 899, 904 (7th Cir. 2000) (noting that the Supreme Court has "placed charitable solicitations by organizations in a category of speech close to the heart of the First Amendment, and distinguished it from 'purely commercial speech'" which "has been placed lower in the First Amendment food chain, somewhere between political speech and pornography"); *Nat'l Fed. of the Blind of Arkansas, Inc. v. Pryor*, 258 F.3d 851, 854 (8th Cir. 2001) ("The Supreme Court has repeatedly held that charity fundraising involves speech that is fully protected by the First Amendment."). Thus, a government may not regulate charitable speech unless the regulation (1) serves a "sufficiently strong" government interest and (2) is "narrowly drawn" to "serve those interests without unnecessarily interfering with First Amendment freedoms." *Vill. of Schaumburg*, 444 U.S. at 636-37; *see also Gresham,* 225 F.3d at 905; *Nat'l Fed. of the Blind v. F.T.C.*, 420 F.3d 331, 338 (4th Cir. 2005). Following the *Village of Schaumburg* decision, this court has uniformly applied the narrow-tailoring requirement to regulations affecting charitable speech.[1]

---

[1] *See, e.g.*, *Wis. Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1251-59 (7th Cir. 1985) (noting that the Supreme Court "has also repeatedly stated that a regulation must be narrowly drawn" and applying a narrow-tailoring analysis); *City of Watseka v. Ill. Pub. Action Council*, 796 F.2d 1547, 1552-57 (7th Cir. 1986) (noting that the Supreme Court routinely requires that a time, place, and manner regulation be "narrowly tailored" and applying

(continued...)

Rather than apply this standard narrow-tailoring require-
ment, the majority instead relies on the *Rowan* decision,
which it reads as requiring only a balancing of interests
between the parties. As an initial matter, the statute at
issue in *Rowan* directly addressed commercial speech, not
charitable speech. *See Rowan*, 397 U.S. at 729 (statute's
prohibitions applied to "pandering advertisements"). This
distinction has constitutional significance: the First Amend-
ment provides greater protections to charitable speech than
commercial speech, including heightened constitutional
scrutiny.[2] *See Gresham*, 225 F.3d at 904. Setting aside this
difference, even within the limited context of commercial
speech, the *Rowan* balancing-of-interests test is not the
governing law. Indeed, the Supreme Court did not clearly
recognize the First Amendment protections applicable to
commercial speech until 1975—five years after *Rowan* was
decided. *See Bolger v. Youngs Drug Products Corp.*, 463 U.S.
60, 64-65 (1983) (noting that "[b]eginning with *Bigelow v.
Virginia*, 421 U.S. 809 (1975), this Court extended the

---

[1] (...continued)
a four-part test that required consideration of whether the
regulation was "narrowly tailored to serve the government
objective"); *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d
1008, 1012-13 (7th Cir. 1990) (noting that the Supreme Court
has reaffirmed "emphatically" that a regulation geared toward
protected speech must be narrowly tailored and applying such an
analysis); *Gresham v. Peterson*, 225 F.3d 899, 905-06 (7th Cir.
2000) (noting that regulations must be "narrowly tailored to serve
a significant government interest" and applying such a test).

[2] This is not intended to suggest that *Rowan*'s teachings pertain-
ing to the substantial government interest in protecting residen-
tial privacy are not relevant when considering First Amendment
challenges to charitable speech restrictions. As discussed *infra*,
these principles continue to be applied routinely in cases involving
both commercial and charitable speech, but *Rowan*'s balancing-of-
interests test does not appear to have survived the test of time.

protection of the First Amendment to commercial speech"). Then, five years later in 1980, the Court issued the seminal *Central Hudson* decision, which established the current governing test for First Amendment challenges to commercial speech. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). Like the charitable speech test, the *Central Hudson* test for commercial speech requires courts to consider whether a regulation affecting commercial speech is narrowly tailored.[3] *See Central Hudson*, 447 U.S. at 565. Thus, whatever *Rowan* has to say regarding the test applicable to First Amendment challenges involving commercial speech must be filtered through subsequent Supreme Court authority. In other words, to the extent that *Rowan* articulated a simple balancing-of-interests test, such a test is no longer the controlling law even in the commercial speech arena, much less in the more-highly protected charitable speech context. *See id.*

This is not to say that the principles addressed in *Rowan* regarding the compelling government interest in residential privacy are no longer good law. To the contrary, the substantial right of residents to find sanctuary in their homes, free from unwanted speech, is just as—if not more—vital

---

[3] The *Central Hudson* test also requires consideration of whether (1) the speech concerns lawful activity and is not misleading; (2) the asserted governmental interest is substantial; and (3) the regulation directly advances the governmental interest. *Central Hudson*, 447 U.S. at 566. Although the *Central Hudson* test is quite similar to the *Village of Schaumburg* test for charitable speech, regulations affecting charitable speech receive heightened scrutiny and, unlike commercial regulations, are presumptively invalid if they are not content neutral. *See Vill. of Schaumburg*, 444 U.S. at 636-37; *Gresham*, 225 F.3d at 904; *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591 (8th Cir. 2005) (discussing and analyzing content-neutrality of regulation affecting charitable speech).

today, where intrusions via the mail, the telephone and, now, email and the internet are ubiquitous. The Supreme Court has repeatedly cited *Rowan* for support in highlighting the sanctity of residential privacy, particularly where the homeowner is a "captive audience" to unwanted speech.[4] But *Rowan* has not been cited by the Supreme Court for the proposition that regulations that affect commercial—much less charitable—speech should be examined via a simple balancing test. Instead, the Supreme Court has limited its application of *Rowan* within the context of traditional First Amendment tests, either to establish the significance of residential privacy interests and/or to address the narrow-tailoring or least-restrictive-means requirements. *See id.*

Nor has this court previously held that *Rowan* created a separate balancing-of-interests test under any type of First Amendment analysis. Rather, consistent with Supreme Court jurisprudence, we have limited our application of *Rowan* to the framework of whether the regulation was narrowly tailored (or, relatedly, whether the government had a sufficiently strong interest in protecting residential privacy).[5]

---

[4] *See, e.g.*, *Vill. of Schaumburg*, 444 U.S. at 639 (noting the interest in residential privacy and citing *Rowan* within a narrow-tailoring analysis); *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y..,* 447 U.S. 530, 542 n.11 (1980) (same); *Carey v. Brown*, 447 U.S. 455, 471 (1980) (citing *Rowan* to establish the substantial interest in residential privacy); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 72, 77-78 (1983) (same); *Frisby v. Schultz*, 487 U.S. 474, 482-85 (1988) (same); *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 814-15 (2000) (citing *Rowan* within a least-restrictive-means analysis); *Hill v. Colorado,* 530 U.S. 703, 717-18, 720 (2000) (citing *Rowan* within the context of a narrow-tailoring analysis).

[5] *See, e.g.*, *Collin v. Smith,* 578 F.2d 1197, 1202 n.8 (7th Cir.
(continued...)

Thus, why the majority turns to *Rowan* for this new-found test is unclear. Although the majority notes that the Indiana Act requires the homeowner to make an initial affirmative act (*i.e.,* signing up for the do-not-call list), this court is not without guidance from our prior cases, as well as cases from other circuits, all of which have considered such opt-in features or other analogous provisions to be pertinent to whether a regulation is narrowly tailored—not as a means to avoid a narrow-tailoring analysis entirely. For instance, in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir. 1998), we addressed a First Amendment challenge to an Illinois statute that allowed homeowners to notify real estate agents that they did not wish to be solicited, and, upon such notification, prohibited door-to-door solicitation. *Id.* at 399. The fact that the statute in *Pearson* required a predicate affirmative act from the homeowner (*i.e.*, notifying the realtor) did not lead us to apply a *Rowan* balancing test. Instead, we applied the standard *Central Hudson* narrow-tailoring analysis. *Id.* at 402-03. And the court was well aware of *Rowan*, discussing it at length, but, tellingly, solely within the context of whether the regulation was narrowly tailored to advance the state's substantial interest. *Id.* at 404-05; *see also South-Suburban Housing Center*, 935 F.2d at 894 (discussing the *Rowan* opt-in feature within a narrow-tailoring analysis). The court also noted that our

---

[5] (...continued)
1978) (citing to *Rowan* for the proposition that the ordinances at issue were not "appropriately narrow ordinances"); *Curtis v. Thompson*, 840 F.2d 1291, 1301-02 (7th Cir. 1988) (applying *Rowan* to a narrow-tailoring analysis pertaining to a commercial speech ordinance); *South-Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 892-94 (7th Cir. 1991) (same); *Pearson v. Edgar*, 153 F.3d 397, 403-05 (7th Cir. 1998) (same).

reliance on *Rowan* in two prior cases[6] had been "weakened by *Discovery Network*'s emphasis on reasonable fit," which, again, appropriately placed *Rowan* squarely within the analytic framework of narrow tailoring. *Id.* at 404.[7]

In examining the constitutionality of the federal do-not-call list, the Tenth Circuit similarly devoted extensive attention to the opt-in feature in the *Rowan* statute, but did so solely within the context of considering whether the federal do-not-call list was narrowly tailored. *See Mainstream Mktg Services, Inc. v. F.T.C. (Mainstream Mktg. II),* 358 F.3d 1228, 1243-44 (10th Cir. 2004). Specifically, the Tenth Circuit held that the opt-in feature in the federal do-not-call list was a compelling factor in establishing that the statute was narrowly tailored. *Id.* Similarly, in a precursor case to *Mainstream Marketing II*, the Tenth Circuit cited our decision in *Pearson*, noting that "[o]ther courts have relied on *Rowan*'s analysis in finding that similar mechanisms of private choice in solicitation restrictions weigh in favor of finding a 'reasonable fit[,]'" and held that "*Rowan*

---

[6] *Pearson* was decided after the Supreme Court vacated our prior decision and remanded the case for reconsideration in light of the then-recently decided *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410 (1993). *See Pearson*, 153 F.3d at 400 (discussing the procedural history).

[7] *See also Vill. of Schaumburg*, 444 U.S. at 639 (citing *Rowan* for the proposition that "[o]ther provisions of the ordinance, which are not challenged here, such as the provision permitting homeowners to bar solicitors from their property by posting signs reading "No Solicitors or Peddlers Invited," § 22-24, suggest the availability of less intrusive and more effective measures to protect privacy"); *Playboy Entertainment Group, Inc.,* 529 U.S. at 814-15 (citing *Rowan* and noting that affirmative acts by homeowners, such as individualized household blocking of unwanted cable television channels, are relevant to whether a statute is the least restrictive means of enforcing a government interest in residential privacy).

demonstrates that the element of private choice in an opt-in feature is relevant for purposes of analyzing 'reasonable fit'. *F.T.C. v. Mainstream Mktg Serv's., Inc. (Mainstream Mktg I)*, 345 F.3d 850, 856 (10th Cir. 2003) (citing *Anderson v. Treadwell*, 294 F.3d 453, 462-63 (2d. Cir. 2002) and *Pearson*, 153 F.3d at 404). Thus, the authority in both this circuit and other circuits indicates that the Indiana Act's opt-in feature does not allow it to circumvent full First Amendment scrutiny when it regulates—even if indirectly—protected speech.

In any event, the Indiana Act is distinguishable from the *Rowan* statute. The majority claims that the Indiana Act places the Attorney General in solely a "ministerial" role akin to the role of the Postmaster General in *Rowan*, purportedly because the Attorney General is given sole discretion only "to decide if the call was placed on behalf of a tax-exempt charity, or if the person who placed the call was a volunteer or employee of that charity." Op. at 11. But this considers only the state's involvement in *enforcing* the statute: it ignores the state's active involvement in crafting numerous exceptions to the statute. Unlike in *Rowan*, the state here has carved out particular categories of calls that a homeowner *cannot* block. These state-created carve-outs include not only charitable calls made by volunteers and employees, but also certain calls by newspaper organizations, real estate agents, and insurance agents. Thus, the homeowner here does not have the plenary power to restrict all intrusions as the homeowner could in *Rowan*. Instead, Indiana has actively immersed itself in regulating the forms of telemarketing speech that homeowners are allowed to block: a homeowner has unfettered discretion to block calls from professional telemarketers, but lacks such discretion when it comes to, for example, calls initiated by employees or volunteers of charities. In my view, this is something more than the mere "ministerial" duty addressed in *Rowan*, where the government did nothing more than enforce a

homeowner's "complete and unfettered discretion" to prevent *all* intrusions.[8] *Rowan,* 397 U.S. at 734; *cf. Pearson*, 153 F.3d at 404 (distinguishing *Rowan* on the basis that the statute there provided unqualified delegation of authority to the homeowner and disapproving of an Illinois statute in which the government crafted the initial distinction between real estate solicitations and other types of solicitations).

Setting aside these distinctions, the majority's opinion is also inconsistent with a series of decisions by other circuits—all of whom uniformly applied the narrow-tailoring requirement to analogous do-not-call regulations. *See Mainstream Mktg I*, 345 F.3d at 856; *Mainstream Mktg II,* 358 F.3d at 1242-44; *Nat'l Fed'n of the Blind*, 420 F.3d at 334; *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591, 596 (8th Cir. 2005). In addition, although all of these cases cite to *Rowan*, none apply the balancing-of-interests test that the majority imports from *Rowan*.

---

[8] The majority cites to footnote 4 in the *Rowan* decision as support for the proposition that the Supreme Court did not intend to limit *Rowan* solely to situations where a homeowner has complete discretion to block intrusions on residential privacy. Op. at 10. My reading of this footnote, however, offers no clues as to the "intent" that the majority ascribes to the Supreme Court. Instead, the footnote merely highlights the central distinguishing element of the *Rowan* statute: the government had *no* role in filtering the types of mail the homeowner could prevent from entering the home. The footnote goes on to highlight that had the government been involved in any form of filtering, the statute would not have been upheld. This is precisely the hurdle that the Indiana Act stumbles on. There is otherwise nothing in the footnote suggesting that the Court intended to expand *Rowan* beyond the operative facts of the statute at issue. If anything, the footnote emphasizes the limited focus of the *Rowan* opinion.

For instance, the Fourth Circuit addressed a First Amendment challenge to the Federal Trade Commission's regulation imposing restrictions on telemarketing practices used for charitable fundraising. *Nat'l Fed'n of the Blind*, 420 F.3d at 334. Like the Indiana Act here, the FTC regulation prohibited calls from professional telemarketers, but not calls by in-house charity staff or volunteers. *Id.* Relying on the *Village of Schaumburg, Munson,* and *Riley* Supreme Court cases, the Fourth Circuit set forth the governing test under the First Amendment as follows: "A regulation will be sustained if (1) it 'serves a sufficiently strong, subordinating interest that the [government] is entitled to protect' and (2) it is 'narrowly drawn . . . to serve the interest without unnecessarily interfering with First Amendment freedoms.'" *Id.* at 338 (citing *Munson*, 467 U.S. at 960-61 (quoting *Schaumburg*, 444 U.S. at 636-37)). Significantly, the Fourth Circuit's disposition relied heavily on *Rowan*—but not for the proposition that *Rowan* altered the governing constitutional test specified in *Village of Schaumburg* and its progeny. Instead, the Fourth Circuit relied on *Rowan* in holding that there was a substantial government interest in residential privacy and, more importantly, that the regulation was narrowly drawn because of its opt-in (or, in the Fourth Circuit's term, "opt-out") nature:

> The parallels between the law at issue in *Rowan* and the do-not-call list in this case are unmistakable. If consumers are constitutionally permitted to opt out of receiving mail which can be discarded or ignored, then surely they are permitted to opt out of receiving phone calls that are more likely to disturb their peace. In this way, a do-not-call list is *more narrowly tailored* to protecting privacy than was the law in *Rowan.*

*Id.* at 342 (emphasis added).

Similarly, the Tenth Circuit applied the traditional narrowly tailored requirement in assessing a First Amendment challenge to the FTC regulations applicable to commercial speech. *Mainstream Mktg. II,* 358 F.3d at 1242-44. Like the Fourth Circuit, the Tenth Circuit placed significant reliance on *Rowan* and the opt-in nature of the statute there, but, again, confined its application of *Rowan* to the traditional framework of whether the regulation was narrowly tailored (*i.e.*, a "reasonable fit" in light of the government's substantial government interest):

> Like the do-not-mail regulation approved in *Rowan*, the national do-not-call registry does not itself prohibit any speech. Instead, it merely "permits a citizen to erect a wall . . . that no advertiser may penetrate without his acquiescence." *See Rowan*, 397 U.S. at 738, 90 S. Ct. 1484. Almost by definition, the do-not-call regulations only block calls that would constitute unwanted intrusions into the privacy of consumers who have signed up for the list. Moreover, it allows consumers who feel susceptible to telephone fraud or abuse to ensure that most commercial callers will not have an opportunity to victimize them. Under the circumstances we address in this case, we conclude that the do-not-call registry's opt-in feature renders it *a narrowly tailored* commercial speech regulation.

*Id.* at 1243. (emphasis added); *see also Mainstream Mktg. I*, 345 F.3d at 856 (limiting *Rowan* to the context of a narrow-tailoring analysis).

Finally, the Eighth Circuit also examined the constitutionality of a state statute that, like the Indiana Act, prohibited charitable solicitation calls by professional telemarketers, but permitted calls made by employees or volunteers. *Fraternal Order of Police*, 431 F.3d at 596. In harmony with the Fourth and Tenth Circuits, the Eighth Circuit similarly relied on *Rowan*, but, once again, solely to establish whether the statute was narrowly tailored. *Id.* at

598-99; *see also Pryor*, 258 F.3d at 855-56 (relying on *Rowan* to determine that the Deceptive Trade Practice Act's limitations on charitable speech were narrowly tailored).

In distinguishing the Eighth and Tenth circuit cases, the majority states that "[n]either the Eighth Circuit nor the Tenth Circuit directly addressed a *Rowan* argument similar to the one the State presses here. Instead, they reversed by employing more standard First Amendment analysis." Op. at 9. True—but these circuits, along with the Fourth Circuit, were unmistakably aware of *Rowan,* and in fact relied extensively upon it to conduct the standard narrow-tailoring analysis. Furthermore, the Attorney General of Indiana filed an *amicus* brief (along with various other states) in the Eighth Circuit's *Fraternal Order of Police* case in support of a North Dakota statute pertaining to charitable speech solicitations, which the Attorney General conceded was "similar" to the Indiana Act. Brief for State of Indiana et al. as *Amici Curiae* Supporting Appellant at 2, 13, *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591 (8th Cir. 2005) (Nos. 03-3848, 04-1619, 04-1620), 2003 WL 23912560. As it now argues here, the Attorney General of Indiana argued before the Eighth Circuit that *Rowan* provided a mere balancing-of-interests test in these circumstances. *Id*. at 25-32. The Eighth Circuit did not accept this invitation to apply such a test and instead applied the traditional *Village of Schaumburg* First Amendment test, which required consideration of whether the statute was narrowly tailored. *Fraternal Order of Police*, 431 F.3d at 597-99.

Similarly, several states filed an *amicus* brief in the Tenth Circuit's *Mainstream Marketing II* case, supporting the federal do-not-call regulations applicable to commercial solicitors. *See* Brief for State of California, et al. as *Amici Curiae* Supporting Appellants in Case No. 03-1429 and Supporting Appellees in Case No. 03-9571 at 1-3, *Mainstream Mktg. Services, Inc. v. F.T.C.*, 358 F.3d 1228 (2004)

(Nos. 03-1429, 03-6258, 03-9571, 03-9594), 2003 WL 24033594. Like the Attorney General of Indiana here, the states argued that *Rowan* created a balancing test, but the Tenth Circuit did not apply such a test in its decision. *See id.* at 4-10*; cf. Mainstream Mktg II,* 358 F.3d at 1242-44. Instead, the Tenth Circuit applied the traditional *Central Hudson* test, which required an examination of whether the statute was narrowly tailored. *Id.* Thus, at a minimum, these circuits did not interpret *Rowan* as requiring nothing more than a balancing of interests. More likely, they appropriately disregarded the states' request for a truncated balancing-of-interests test and instead applied *Rowan* solely within the constraints created by subsequent Supreme Court authority.

I would apply a similar First Amendment analysis here to conclude that the charitable exception in the Indiana Act is content neutral and narrowly drawn to advance the substantial right of residents to be undisturbed by unwanted phone calls in the privacy of their homes. *See, e.g.*, *Fraternal Order of Police*, 431 F.3d at 596-99 (holding that an analogous North Dakota statute was content neutral under *Hill v. Colorado*, 530 U.S. 703 (2000) and was narrowly tailored); *Nat'l Fed'n of the Blind*, 420 F.3d at 342-44 (holding than the FTC's "do not call" regulations pertaining to charitable speech were narrowly drawn to serve the government's interests); *Mainstream Mktg. I*, 345 F.3d at 855-56 (upholding FTC's do-not-call regulations pertaining to commercial speech because they were narrowly drawn to serve a substantial governmental interest). Although the question of whether the Indiana Act is a content neutral regulation is a close one, it is nonetheless a "regulation that serves purposes unrelated to the content of expression . . . even if it has an incidental effect on certain speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). That is, the record reflects that the exemptions that Indiana has made for in-house employ-

ees or volunteers of charities are not based upon disdain for the content of the message conveyed, but rather are based on the form or manner in which the message is delivered.[9] Specifically, there was compelling evidence in the record that professional telemarketers have the capacity to generate a significantly greater number of telephone calls than in-house employees or volunteers, and thus, irrespective of the content of the message, have greater capacity to cause disruptions to residential privacy. Indeed, as the Eighth Circuit noted in analyzing a North Dakota statute with very similar provisions to the Indiana Act, "North Dakota has not distinguished between professional and in-house charitable solicitors because of any disagreement with the message that would be conveyed, for the message would be identical regardless of who conveyed it." *Fraternal Order of Police*, 431 F.3d at 596. In addition, "a regulation that distinguishes between speech activities likely to produce the consequences that it seeks to prevent and speech activities unlikely to have those consequences 'cannot be struck down for failure to maintain content neutrality.'" *Id.* at 596-97 (citing *Hill v. Colorado*, 530 U.S. 703, 724 (2000)).

---

[9] The district court in this case analyzed the statute as a time, place or manner regulation. The First Amendment test for such a regulation is essentially identical to the *Village of Schaumburg* test, except for the added requirement that there be ample opportunities for alternative means of communication. *See Fraternal Order of Police*, 431 F.3d at 597 (noting that the *Schaumburg* test is "very similar" to time, place, or manner regulation). As the district court correctly concluded, there can be no doubt that the Indiana Act allows for sufficient alternate means of communication. For instance, the charities are not precluded from using their own employees or volunteers to solicit funds, nor are they prevented from using direct mailings, newsprint advertisements, or the internet to solicit funds. Thus, the Indiana Act would also pass constitutional scrutiny if analyzed as a time, place, or manner regulation.

There can be no doubt that Indiana has a substantial interest in protecting residential privacy. *Rowan* and its progeny firmly establish residential privacy as a compelling interest. Furthermore, the Indiana Act is also narrowly tailored to advance this interest. Consistent with the holdings in this and other circuits, the opt-in feature is strong evidence of the narrow tailoring of the Indiana Act's restrictions on charitable speech. *See, e.g.*, *Pearson*, 153 F.3d at 399, 403; *South-Suburban Housing Center*, 935 F.2d at 894*; Nat'l Fed'n of the Blind*, 420 F.3d at 342; *Fraternal Order of Police*, 431 F.3d 598-99; *Mainstream Mktg II,* 358 F.3d at 1242-44. Rather than simply issue blanket prohibitions against all charitable speech provided by professional telemarketers, the statute allows homeowners to decide individually whether they find these types of calls intrusive. In addition, as noted above, the exemptions in the statute are sensible carve-outs based upon the likelihood of intrusiveness of particular forms of telephone calls, rather than an attempt to regulate content. In this sense, Indiana is seeking to target as directly as possible those telemarketing calls that are most likely to disrupt residential privacy. Accordingly, the Indiana Act survives constitutional scrutiny under the standard First Amendment test applicable to charitable speech.

I emphasize the importance of applying full constitutional scrutiny in this case because First Amendment protections, of course, reside at the core of our democratic process and are crucial to the free exchange of ideas. In the present case, applying lowered constitutional scrutiny may initially appear less troubling because the form of the speech here (*i.e.*, solicitation calls placed by telemarketers) is plainly disfavored by many. But providing such a potentially broad circumvention from full First Amendment scrutiny may prove to be an unfortunate choice when less-disfavored forms of speech are at issue in the future. For the reasons stated above, I believe the proper analysis requires consid-

eration of whether the Indiana Act is a content neutral regulation narrowly tailored to advance a substantial government interest, in accordance with the traditional First Amendment test.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*